# MONROE ET AL. *v.* PAPE ET AL.

No. 39. Argued November 8, 1960.—Decided February 20, 1961.

168

*Donald Page Moore* argued the cause for petitioners. With him on the brief were *Morris L. Ernst, Ernst Liebman, Charles Liebman* and *John W. Rogers.*

*Sydney R. Drebin* argued the cause for respondents. With him on the brief was *John C. Melaniphy.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case presents important questions concerning the construction of R. S. § 1979, 42 U. S. C. § 1983, which reads as follows:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The complaint alleges that 13 Chicago police officers broke into petitioners' home in the early morning, routed them from bed, made them stand naked in the living room, and ransacked every room, emptying drawers and ripping mattress covers. It further alleges that Mr. Monroe was then taken to the police station and detained on "open" charges for 10 hours, while he was interrogated about a two-day-old murder, that he was not taken before a magistrate, though one was accessible, that he was not permitted to call his family or attorney, that he was subsequently released without criminal charges being preferred against him. It is alleged that the officers had no search warrant and no arrest warrant and that they acted "under color of the statutes, ordinances, regulations, customs and usages" of Illinois and of the City of Chicago. Federal jurisdiction was asserted under R. S. § 1979, which we have set out above, and 28 U. S. C. § 1343 [1] and 28 U. S. C. § 1331.[2]

---

[1] This section provides in material part:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

. . . . .

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

[2] Subsection (a) provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value

The City of Chicago moved to dismiss the complaint on the ground that it is not liable under the Civil Rights Acts nor for acts committed in performance of its governmental functions. All defendants moved to dismiss, alleging that the complaint alleged no cause of action under those Acts or under the Federal Constitution. The District Court dismissed the complaint. The Court of Appeals affirmed, 272 F. 2d 365, relying on its earlier decision, *Stift* v. *Lynch*, 267 F. 2d 237. The case is here on a writ of certiorari which we granted because of a seeming conflict of that ruling with our prior cases. 362 U. S. 926.

## I.

Petitioners claim that the invasion of their home and the subsequent search without a warrant and the arrest and detention of Mr. Monroe without a warrant and without arraignment constituted a deprivation of their "rights, privileges, or immunities secured by the Constitution" within the meaning of R. S. § 1979. It has been said that when 18 U. S. C. § 241 made criminal a conspiracy "to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution," it embraced only rights that an individual has by reason of his relation to the central government, not to state governments. *United States* v. *Williams*, 341 U. S. 70. Cf. *United States* v. *Cruikshank*, 92 U. S. 542; *Ex parte Yarbrough*, 110 U. S. 651; *Guinn* v. *United States*, 238 U. S. 347. But the history of the section of the Civil Rights Act presently involved does not permit such a narrow interpretation.

of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

In their complaint, petitioners also invoked R. S. §§ 1980, 1981, 42 U. S. C. §§ 1985, 1986. Before this Court, however, petitioners have limited their claim to recovery to the liability imposed by § 1979. Accordingly, only that section is before us.

Section 1979 came onto the books as § 1 of the Ku Klux Act of April 20, 1871. 17 Stat. 13. It was one of the means whereby Congress exercised the power vested in it by § 5 of the Fourteenth Amendment to enforce the provisions of that Amendment.[3] Senator Edmunds, Chairman of the Senate Committee on the Judiciary, said concerning this section:

> "The first section is one that I believe nobody objects to, as defining the rights secured by the Constitution of the United States when they are assailed by any State law or under color of any State law, and it is merely carrying out the principles of the civil rights bill,[4] which has since become a part of the Constitution,"[5] *viz.*, the Fourteenth Amendment.

Its purpose is plain from the title of the legislation, "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." 17 Stat. 13. Allegation of facts constituting a deprivation under color of state authority of a right guaranteed by the Fourteenth Amendment satisfies to that extent the requirement of R. S. § 1979. See *Douglas* v. *Jeannette,* 319 U. S. 157, 161–162. So far petitioners are on solid ground. For the guarantee against unreasonable searches and seizures contained in the Fourth Amendment has been made applicable to the States by reason of the Due Process Clause of the Fourteenth Amendment. *Wolf* v. *Colorado,* 338 U. S. 25; *Elkins* v. *United States,* 364 U. S. 206, 213.

## II.

There can be no doubt at least since *Ex parte Virginia,* 100 U. S. 339, 346–347, that Congress has the power to

---

[3] See Cong. Globe, 42d Cong., 1st Sess., App. 68, 80, 83–85.

[4] Act of April 9, 1866, 14 Stat. 27.

[5] *Supra,* note 3, 568.

enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it. See *Home Tel. & Tel. Co.* v. *Los Angeles,* 227 U. S. 278, 287–296. The question with which we now deal is the narrower one of whether Congress, in enacting § 1979, meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position. Cf. *Williams* v. *United States,* 341 U. S. 97; *Screws* v. *United States,* 325 U. S. 91; *United States* v. *Classic,* 313 U. S. 299. We conclude that it did so intend.

It is argued that "under color of" enumerated state authority excludes acts of an official or policeman who can show no authority under state law, state custom, or state usage to do what he did. In this case it is said that these policemen, in breaking into petitioners' apartment, violated the Constitution [6] and laws of Illinois. It is pointed out that under Illinois law a simple remedy is offered for that violation and that, so far as it appears, the courts of Illinois are available to give petitioners that full redress which the common law affords for violence done to a person; and it is earnestly argued that no "statute, ordinance, regulation, custom or usage" of Illinois bars that redress.

The Ku Klux Act grew out of a message sent to Congress by President Grant on March 23, 1871, reading:

"A condition of affairs now exists in some States of the Union rendering life and property insecure and

---

[6] Illinois Const., Art. II, § 6, provides:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue without probable cause, supported by affidavit, particularly describing the place to be searched, and the persons or things to be seized." Respondents also point to Ill. Rev. Stat., c. 38, §§ 252, 449.1; Chicago, Illinois, Municipal Code, § 11–40.

the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these evils is beyond the control of State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore, I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States. . . ." [7]

The legislation—in particular the section with which we are now concerned—had several purposes. There are threads of many thoughts running through the debates. One who reads them in their entirety sees that the present section had three main aims.

*First,* it might, of course, override certain kinds of state laws. Mr. Sloss of Alabama, in opposition, spoke of that object and emphasized that it was irrelevant because there were no such laws: [8]

"The first section of this bill prohibits any invidious legislation by States against the rights or privileges of citizens of the United States. The object of this section is not very clear, as it is not pretended by its advocates on this floor that any State has passed any laws endangering the rights or privileges of the colored people."

*Second,* it provided a remedy where state law was inadequate. That aspect of the legislation was summed up as follows by Senator Sherman of Ohio:

". . . it is said the reason is that any offense may be committed upon a negro by a white man, and a

---

[7] Cong. Globe, 42d Cong., 1st Sess., p. 244.
[8] *Id.,* App. 268.

negro cannot testify in any case against a white man, so that the only way by which any conviction can be had in Kentucky in those cases is in the United States courts, because the United States courts enforce the United States laws by which negroes may testify." [9]

But the purposes were much broader. The *third* aim was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice. The opposition to the measure complained that "It overrides the reserved powers of the States," [10] just as they argued that the second section of the bill "absorb[ed] the entire jurisdiction of the States over their local and domestic affairs." [11]

This Act of April 20, 1871, sometimes called "the third 'force bill,' " was passed by a Congress that had the Klan "particularly in mind." [12]  The debates are replete with references to the lawless conditions existing in the South in 1871.  There was available to the Congress during these debates a report, nearly 600 pages in length, dealing with the activities of the Klan and the inability of the state governments to cope with it. [13]  This report was drawn on by many of the speakers. [14]  It was not the unavailability of state remedies but the failure of certain States to enforce the laws with an equal hand that fur-

---

[9] *Id.*, p. 345.

[10] *Id.*, p. 365.  The speaker, Mr. Arthur of Kentucky, had no doubts as to the scope of § 1: "[I]f the sheriff levy an execution, execute a writ, serve a summons, or make an arrest, all acting under a solemn, official oath, though as pure in duty as a saint and as immaculate as a seraph, *for a mere error of judgment,* [he is liable] . . . ."  *Ibid.*  (Italics added.)

[11] *Id.*, p. 366.

[12] Randall, The Civil War and Reconstruction (1937), p. 857.

[13] S. Rep. No. 1, 42d Cong., 1st Sess.

[14] See, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., App. 166–167.

nished the powerful momentum behind this "force bill." Mr. Lowe of Kansas said:

"While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress." [15]

Mr. Beatty of Ohio summarized in the House the case for the bill when he said:

". . . certain States have denied to persons within their jurisdiction the equal protection of the laws. The proof on this point is voluminous and unquestionable. . . . [M]en were murdered, houses were burned, women were outraged, men were scourged, and officers of the law shot down; and the State made no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent. The State, from lack of power or inclination, practically denied the equal protection of the law to these persons." [16]

While one main scourge of the evil—perhaps the leading one—was the Ku Klux Klan,[17] the remedy created was

---

[15] *Id.*, p. 374.

[16] *Id.*, p. 428.

[17] As Randall, *op. cit.,* *supra*, note 12, p. 855, says in discussing the Ku Klux Klan: "A friendly view of the order might represent it as an agency of social control in the South. Yet it never attained the dignity of the vigilance committees of the western states nor of the committees of safety of Revolutionary-times."

176

not a remedy against it or its members but against those who representing a State in some capacity were *unable* or *unwilling* to enforce a state law. Senator Osborn of Florida put the problem in these terms:[18]

"That the State courts in the several States have been unable to enforce the criminal laws of their respective States or to suppress the disorders existing, and in fact that the preservation of life and property in many sections of the country is beyond the power of the State government, is a sufficient reason why Congress should, so far as they have authority under the Constitution, enact the laws necessary for the protection of citizens of the United States. The question of the constitutional authority for the requisite legislation has been sufficiently discussed."

There was, it was said, no quarrel with the state laws on the books. It was their lack of enforcement that was the nub of the difficulty. Speaking of conditions in Virginia, Mr. Porter of that State said:[19]

"The outrages committed upon loyal men there are under the forms of law."

Mr. Burchard of Illinois pointed out that the statutes of a State may show no discrimination:[20]

"If the State Legislature pass a law discriminating against any portion of its citizens, or if it fails to enact provisions equally applicable to every class for the protection of their person and property, it will be admitted that the State does not afford the equal protection. But if the statutes show no discrimina-

---

[18] Cong. Globe, 42d Cong., 1st Sess. 653.

[19] *Id.*, App. 277.

[20] *Id.*, App. 315.

tion, yet in its judicial tribunals one class is unable to secure that enforcement of their rights and punishment for their infraction which is accorded to another, or if secret combinations of men are allowed by the Executive to band together to deprive one class of citizens of their legal rights without a proper effort to discover, detect, and punish the violations of law and order, the State has not afforded to all its citizens the equal protection of the laws."

Mr. Hoar of Massachusetts stated: [21]

"Now, it is an effectual denial by a State of the equal protection of the laws when any class of officers charged under the laws with their administration permanently and as a rule refuse to extend that protection. If every sheriff in South Carolina refuses to serve a writ for a colored man and those sheriffs are kept in office year after year by the people of South Carolina, and no verdict against them for their failure of duty can be obtained before a South Carolina jury, the State of South Carolina, through the class of officers who are its representatives to afford the equal protection of the laws to that class of citizens, has denied that protection. If the jurors of South Carolina constantly and as a rule refuse to do justice between man and man where the rights of a particular class of its citizens are concerned, and that State affords by its legislation no remedy, that is as much a denial to that class of citizens of the equal protection of the laws as if the State itself put on its statute-book a statute enacting that no verdict should be rendered in the courts of that State in favor of this class of citizens."

---

[21] *Id.*, p. 334.

Senator Pratt of Indiana spoke of the discrimination against Union sympathizers and Negroes in the actual enforcement of the laws: [22]

> "Plausibly and sophistically it is said the laws of North Carolina do not discriminate against them; that the provisions in favor of rights and liberties are general; that the courts are open to all; that juries, grand and petit, are commanded to hear and redress without distinction as to color, race, or political sentiment.
>
> "But it is a fact, asserted in the report, that of the hundreds of outrages committed upon loyal people through the agency of this Ku Klux organization not one has been punished. This defect in the administration of the laws does not extend to other cases. Vigorously enough are the laws enforced against Union people. They only fail in efficiency when a man of known Union sentiments, white or black, invokes their aid. Then Justice closes the door of her temples."

It was precisely that breadth of the remedy which the opposition emphasized. Mr. Kerr of Indiana referring to the section involved in the present litigation said:

> "This section gives to any person who may have been injured in any of his rights, privileges, or immunities of person or property, a civil action for damages against the wrongdoer in the Federal courts. The offenses committed against him may be the common violations of the municipal law of his State. It may give rise to numerous vexations and outrageous prosecutions, inspired by mere mercenary considerations, prosecuted in a spirit of plunder, aided by the crimes of perjury and subornation of perjury, more reckless and dangerous to society than the alleged

---

[22] *Id.*, p. 505.

offenses out of which the cause of action may have arisen. It is a covert attempt to transfer another large portion of jurisdiction from the State tribunals, to which it of right belongs, to those of the United States. It is neither authorized nor expedient, and is not calculated to bring peace, or order, or domestic content and prosperity to the disturbed society of the South. The contrary will certainly be its effect." [23]

Mr. Voorhees of Indiana, also speaking in opposition, gave it the same construction: [24]

"And now for a few moments let us inspect the provisions of this bill, inspired as it is by the waning and decaying fortunes of the party in power, and called for, as I have shown, by no public necessity whatever. The first and second sections are designed to transfer all criminal jurisdiction from the courts of the States to the courts of the United States. This is to be done upon the assumption that the courts of the southern States fail and refuse to do their duty in the punishment of offenders against the law."

Senator Thurman of Ohio spoke in the same vein about the section we are now considering: [25]

"It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the

---

[23] *Id.*, App., p. 50. Mr. Golladay of Tennessee expressed the same concern:

"Is the great State of New York invaded every time a murder is committed within her bounds? Was the great State of Pennsylvania invaded when rioters in the city of Philadelphia burned a public building? Was the great State of Massachusetts invaded when Webster, one of her first scholars, within the walls of Harvard murdered Parkman, or later, when evil-disposed persons violated her laws in Lowell? Did they require the Army and Navy and martial law? And, sir, because a midnight murderer is sometimes found in the South it should not be regarded as an invasion." *Id.*, App. 160.

[24] *Id.*, App. 179.          [25] *Id.*, App. 216.

Constitution of the United States, to bring an action against the wrong-doer in the Federal courts, and that without any limit whatsoever as to the amount in controversy. The deprivation may be of the slightest conceivable character, the damages in the estimation of any sensible man may not be five dollars or even five cents; they may be what lawyers call merely nominal damages; and yet by this section jurisdiction of that civil action is given to the Federal courts instead of its being prosecuted as now in the courts of the States."

The debates were long and extensive. It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies.

Much is made of the history of § 2 of the proposed legislation. As introduced § 2 was very broad:

". . . if two or more persons shall, within the limits of any State, band, conspire, or combine together to do any act in violation of the rights, privileges, or immunities of any person, to which he is entitled under the Constitution and laws of the United States, which, committed within a place under the sole and exclusive jurisdiction of the United States, would, under any law of the United States then in force, constitute the crime of either murder, manslaughter, mayhem, robbery, assault and battery, perjury, subornation of perjury, criminal obstruction of legal process or resistance of officers in discharge of official duty, arson, or larceny; and if one or more of the parties to said conspiracy or combination shall do

any act to effect the object thereof, all the parties
to or engaged in said conspiracy or combination,
whether principals or accessories, shall be deemed
guilty of a felony . . . ."

It was this provision that raised the greatest storm. It
was § 2 that was rewritten so as to be in the main confined
to conspiracies to interfere with a federal or state officer
in the performance of his duties. 17 Stat. 13. Senator
Trumbull said: [26]

"Those provisions were changed, and as the bill
passed the House of Representatives, it was under-
stood by the members of that body to go no further
than to protect persons in the rights which were guar-
antied to them by the Constitution and laws of the
United States, and it did not undertake to furnish
redress for wrongs done by one person upon another
in any of the States of the Union in violation of their
laws, unless he also violated some law of the United
States, nor to punish one person for an ordinary
assault and battery committed on another in a State."

But § 1—the section with which we are here con-
cerned—was not changed as respects any feature with
which we are presently concerned.[27] The words "under

[26] *Id.*, p. 579.

[27] Section 1 in the bill as originally introduced read as follows:

"That any person who, under color of any law, statute, ordinance,
regulation, custom, or usage of any State, shall subject, or cause to
be subjected, any person within the jurisdiction of the United States
to the deprivation of any rights, privileges, or immunities secured
by the Constitution of the United States, shall, any such law, statute,
ordinance, regulation, custom, or usage of the State to the contrary
notwithstanding, be liable to the party injured in any action at law,
suit in equity, or other proper proceeding for redress; such pro-
ceeding to be prosecuted in the several district or circuit courts of
the United States, with and subject to the same rights of appeal,
review upon error, and other remedies provided in like cases in such

color of" law were in the legislation from the beginning to the end. The changes hailed by the opposition—indeed the history of the evolution of § 2 much relied upon now— are utterly irrelevant to the problem before us, *viz.,* the meaning of "under color of" law. The vindication of States' rights which was hailed in the amendments to § 2 raises no implication as to the construction to be given to "color of any law" in § 1. The scope of § 1—under any construction—is admittedly narrower than was the scope of the original version of § 2. Opponents of the Act, however, did not fail to note that by virtue of § 1 federal courts would sit in judgment on the misdeeds of state officers.[28] Proponents of the Act, on the other hand, were aware of the extension of federal power contemplated by every section of the Act. They found justification, however, for this extension in considerations such as those advanced by Mr. Hoar: [29]

> "The question is not whether a majority of the people in a majority of the States are likely to be attached to and able to secure their own liberties. The question is not whether the majority of the people in every State are not likely to desire to secure their own rights. It is, whether a majority of the people in every State are sure to be so attached to the principles of civil freedom and civil justice as to be as much desirous of preserving the liberties of others as their own, as to insure that under no temptation of party spirit, under no political excitement, under

courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication,' and the other remedial laws of the United States which are in their nature applicable in such cases."

[28] See text at note 23, *supra;* see note 10, *supra.*

[29] Cong. Globe, 42d Cong., 1st Sess., pp. 334–335.

no jealousy of race or caste, will the majority either in numbers or strength in any State seek to deprive the remainder of the population of their civil rights."

Although the legislation was enacted because of the conditions that existed in the South at that time, it is cast in general language and is as applicable to Illinois as it is to the States whose names were mentioned over and again in the debates. It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court.

We had before us in *United States* v. *Classic, supra,* § 20 of the Criminal Code, 18 U. S. C. § 242,[30] which provides a criminal punishment for anyone who "under color of any law, statute, ordinance, regulation, or custom" subjects any inhabitant of a State to the deprivation of "any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." Section 242 first came into the law as § 2 of the Civil Rights Act, Act of April 9, 1866, 14 Stat. 27. After passage of the Fourteenth Amendment, this provision was re-enacted and amended by §§ 17, 18, Act of May 31, 1870, 16 Stat. 140, 144.[31] The right involved in the *Classic* case was the right of voters in a primary to have their votes counted. The laws of Louisiana required the defendants "to count the ballots, to record the result of the count, and

---

[30] Then 18 U. S. C. § 52.

[31] For a full history of the evolution of 18 U. S. C. § 242, see *Screws* v. *United States,* 325 U. S. 91, 98–100; *United States* v. *Classic,* 313 U. S. 299, 327, n. 10; cf. *Hague* v. *C. I. O.,* 307 U. S. 496, 509–510.

to certify the result of the election." *United States* v. *Classic, supra,* 325–326. But according to the indictment they did not perform their duty. In an opinion written by Mr. Justice (later Chief Justice) Stone, in which Mr. Justice Roberts, Mr. Justice Reed, and Mr. Justice Frankfurter joined, the Court ruled, "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *Id.,* 326. There was a dissenting opinion; but the ruling as to the meaning of "under color of" state law was not questioned.

That view of the meaning of the words "under color of" state law, 18 U. S. C. § 242, was reaffirmed in *Screws* v. *United States, supra,* 108–113. The acts there complained of were committed by state officers in performance of their duties, *viz.,* making an arrest effective. It was urged there, as it is here, that "under color of" state law should not be construed to duplicate in federal law what was an offense under state law. *Id.* (dissenting opinion) 138–149, 157–161. It was said there, as it is here, that the ruling in the *Classic* case as to the meaning of "under color of" state law was not in focus and was ill-advised. *Id.* (dissenting opinion) 146–147. It was argued there, as it is here, that "under color of" state law included only action taken by officials pursuant to state law. *Id.* (dissenting opinion) 141–146. We rejected that view. *Id.,* 110–113 (concurring opinion) 114–117. We stated:

"The construction given § 20 [18 U. S. C. § 242] in the *Classic* case formulated a rule of law which has become the basis of federal enforcement in this important field. The rule adopted in that case was formulated after mature consideration. It should be good for more than one day only. We do not have here a situation comparable to *Mahnich* v. *Southern S. S. Co.,* 321 U. S. 96, where we

overruled a decision demonstrated to be a sport in the law and inconsistent with what preceded and what followed. The *Classic* case was not the product of hasty action or inadvertence. It was not out of line with the cases which preceded. It was designed to fashion the governing rule of law in this important field. We are not dealing with constitutional interpretations which throughout the history of the Court have wisely remained flexible and subject to frequent re-examination. The meaning which the *Classic* case gave to the phrase 'under color of any law' involved only a construction of the statute. Hence if it states a rule undesirable in its consequences, Congress can change it. We add only to the instability and uncertainty of the law if we revise the meaning of § 20 [18 U. S. C. § 242] to meet the exigencies of each case coming before us." *Id.,* 112–113.

We adhered to that view in *Williams* v. *United States, supra,* 99.

Mr. Shellabarger, reporting out the bill which became the Ku Klux Act, said of the provision with which we now deal:

"The model for it will be found in the second section of the act of April 9, 1866, known as the 'civil rights act.' . . . This section of this bill, on the same state of facts, not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights . . . ."[32]

Thus, it is beyond doubt that this phrase should be accorded the same construction in both statutes—in § 1979 and in 18 U. S. C. § 242.

---

[32] Cong. Globe, 42d Cong., 1st Sess., App. 68.

186

Since the *Screws* and *Williams* decisions, Congress has had several pieces of civil rights legislation before it. In 1956 one bill reached the floor of the House. This measure had at least one provision in it penalizing actions taken "under color of law or otherwise." [33] A vigorous minority report was filed attacking, *inter alia,* the words "or otherwise." [34] But not a word of criticism of the phrase "under color of" state law as previously construed by the Court is to be found in that report.

Section 131 (c) of the Act of September 9, 1957, 71 Stat. 634, 637, amended 42 U. S. C. § 1971 by adding a new subsection which provides that no person "whether acting under color of law or otherwise" shall intimidate any other person in voting as he chooses for federal officials. A vigorous minority report was filed [35] attacking the wide scope of the new subsection by reason of the words "or otherwise." It was said in that minority report that those words went far beyond what this Court had construed "under color of law" to mean.[36] But there was not a word of criticism directed to the prior construction given by this Court to the words "under color of" law.

The Act of May 6, 1960, 74 Stat. 86, uses "under color of" law in two contexts, once when § 306 defines "officer of election" and next when § 601 (a) gives a judicial remedy on behalf of a qualified voter denied the opportunity to register. Once again there was a Committee report containing minority views.[37] Once again no one challenged the scope given by our prior decisions to the phrase "under color of" law.

---

[33] H. R. Rep. No. 2187, 84th Cong., 2d Sess., p. 16.

[34] *Id.,* p. 26.

[35] H. R. Rep. No. 291, 85th Cong., 1st Sess., pp. 24–60.

[36] *Id.,* pp. 57–58.

[37] H. R. Rep. No. 956, 86th Cong., 1st Sess., pp. 32–42.

If the results of our construction of "under color of" law were as horrendous as now claimed, if they were as disruptive of our federal scheme as now urged, if they were such an unwarranted invasion of States' rights as pretended, surely the voice of the opposition would have been heard in those Committee reports. Their silence and the new uses to which "under color of" law have recently been given reinforce our conclusion that our prior decisions were correct on this matter of construction.

We conclude that the meaning given "under color of" law in the *Classic* case and in the *Screws* and *Williams* cases was the correct one; and we adhere to it.

In the *Screws* case we dealt with a statute that imposed criminal penalties for acts "wilfully" done. We construed that word in its setting to mean the doing of an act with "a specific intent to deprive a person of a federal right." 325 U. S., at 103. We do not think that gloss should be placed on § 1979 which we have here. The word "wilfully" does not appear in § 1979. Moreover, § 1979 provides a civil remedy, while in the *Screws* case we dealt with a criminal law challenged on the ground of vagueness. Section 1979 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.

So far, then, the complaint states a cause of action. There remains to consider only a defense peculiar to the City of Chicago.

## III.

The City of Chicago asserts that it is not liable under § 1979. We do not stop to explore the whole range of questions tendered us on this issue at oral argument and in the briefs. For we are of the opinion that Congress did not undertake to bring municipal corporations within the ambit of § 1979.

When the bill that became the Act of April 20, 1871, was being debated in the Senate, Senator Sherman of Ohio proposed an amendment which would have made "the inhabitants of the county, city, or parish" in which certain acts of violence occurred liable "to pay full compensation" to the person damaged or his widow or legal representative.[38] The amendment was adopted by the Senate.[39] The House, however, rejected it.[40] The Conference Committee reported another version.[41] The

---

[38] Cong. Globe, 42d Cong., 1st Sess., p. 663. The proposed amendment read:

"That if any house, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down, burned, or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled together; and if such offense was committed to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the inhabitants of the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense if living, or to his widow or legal representative if dead; and such compensation may be recovered by such person or his representative by a suit in any court of the United States of competent jurisdiction in the district in which the offense was committed, to be in the name of the person injured, or his legal representative, and against said county, city, or parish. And execution may be issued on a judgment rendered in such suit and may be levied upon any property, real or personal, of any person in said county, city, or parish, and the said county, city, or parish may recover the full amount of such judgment, costs and interest, from any person or persons engaged as principal or accessory in such riot in an action in any court of competent jurisdiction."

[39] Id., 704–705.

[40] Id., 725.

[41] "That if any house, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down,

House rejected the Conference report.[42] In a second conference the Sherman amendment was dropped and in its place § 6 of the Act of April 20, 1871, was substi-

burned, or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled together, with intent to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense, if living, or to his widow or legal representative if dead; and such compensation may be recovered in an action on the case by such person or his representative in any court of the United States of competent jurisdiction in the district in which the offense was committed, such action to be in the name of the person injured, or his legal representative, and against said county, city, or parish, and in which action any of the parties committing such acts may be joined as defendants. And any payment of any judgment, or part thereof unsatisfied, recovered by the plaintiff in such action, may, if not satisfied by the individual defendant therein within two months next after the recovery of such judgment upon execution duly issued against such individual defendant in such judgment, and returned unsatisfied, in whole or in part, be enforced against such county, city, or parish, by execution, attachment, mandamus, garnishment, or any other proceeding in aid of execution or applicable to the enforcement of judgments against municipal corporations; and such judgment shall be a lien as well upon all moneys in the treasury of such county, city, or parish, as upon the other property thereof. And the court in any such action may on motion cause additional parties to be made therein prior to issue joined, to the end that justice may be done. And the said county, city, or parish may recover the full amount of such judgment, by it paid, with costs and interest, from any person or persons engaged as principal or accessory in such riot, in an action in any court of competent jurisdiction. And such county, city, or parish, so paying, shall also be subrogated to all the plaintiff's rights under such judgment." *Id.,* 749.

[42] Cong. Globe, 42d Cong., 1st Sess. 800–801.

tuted.[43]   This new section, which is now R. S. § 1981, 42
U. S. C. § 1986, dropped out all provision for municipal
liability and extended liability in damages to "any person
or persons, having knowledge that any" of the specified
wrongs are being committed.   Mr. Poland, speaking for
the House Conferees about the Sherman proposal to make
municipalities liable, said:

> "We informed the conferees on the part of the
> Senate that the House had taken a stand on that
> subject and would not recede from it; that that sec-
> tion imposing liability upon towns and counties must
> go out or we should fail to agree." [44]

The objection to the Sherman amendment stated by Mr.
Poland was that "the House had solemnly decided that in
their judgment Congress had no constitutional power to
impose any obligation upon county and town organiza-
tions, the mere instrumentality for the administration of
state law." [45]   The question of constitutional power of
Congress to impose civil liability on municipalities was
vigorously debated with powerful arguments advanced in
the affirmative.[46]

Much reliance is placed on the Act of February 25, 1871,
16 Stat. 431, entitled "An Act prescribing the Form of the
enacting and resolving Clauses of Acts and Resolutions
of Congress, and Rules for the Construction thereof."
Section 2 of this Act provides that "the word 'person' may
extend and be applied to bodies politic and corporate." [47]

---

[43] *Id.,* 804.

[44] *Id.,* 804.

[45] *Ibid.*

[46] See especially the comments of Senator Sherman.   *Id.,* 820–821.

[47] This Act has been described as an instance where "Congress
supplies its own dictionary."   Frankfurter, Some Reflections on the
Reading of Statutes, 47 Col. L. Rev. 527, 536.   The present code

It should be noted, however, that this definition is merely an allowable, not a mandatory, one. It is said that doubts should be resolved in favor of municipal liability because private remedies against officers for illegal searches and seizures are conspicuously ineffective,[48] and because municipal liability will not only afford plaintiffs responsible defendants but cause those defendants to eradicate abuses that exist at the police level.[49] We do not reach those policy considerations. Nor do we reach the constitutional question whether Congress has the power to make municipalities liable for acts of its officers that violate the civil rights of individuals.

The response of the Congress to the proposal to make municipalities liable for certain actions being brought within federal purview by the Act of April 20, 1871, was so antagonistic that we cannot believe that the word "person" was used in this particular Act to include them.[50]

provision defining "person" (1 U. S. C. § 1) does not in terms apply to bodies politic. See Reviser's Note, Vol. I, Rev. U. S. Stats. 1872, p. 19.

[48] See note, 100 U. of Pa. L. Rev. 1182, 1206–1212.

[49] See Foote, Tort Remedies for Police Violations of Individual Rights, 39 Minn. L. Rev. 493, 514. Cf. Fuller & Casner, Municipal Tort Liability in Operation, 54 Harv. L. Rev. 437, 459.

[50] This has been the view of the lower federal courts. *Charlton* v. *City of Hialeah*, 188 F. 2d 421, 423; *Hewitt* v. *City of Jacksonville*, 188 F. 2d 423, 424; *Cobb* v. *City of Malden*, 202 F. 2d 701, 703; *Agnew* v. *City of Compton*, 239 F. 2d 226, 230; *Cuiksa* v. *City of Mansfield*, 250 F. 2d 700, 703–704. In a few cases in which equitable relief has been sought, a municipality has been named, along with city officials, as defendant where violations of 42 U. S. C. § 1983 were alleged. See, *e. g.*, *Douglas* v. *City of Jeannette*, 319 U. S. 157; *Holmes* v. *City of Atlanta*, 350 U. S. 879. The question dealt with in our opinion was not raised in those cases, either by the parties or by the Court. Since we hold that a municipal corporation is not a "person" within the meaning of § 1983, no inference to the contrary can any longer be drawn from those cases.

Accordingly we hold that the motion to dismiss the complaint against the City of Chicago was properly granted. But since the complaint should not have been dismissed against the officials the judgment must be and is

*Reversed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring.

Were this case here as one of first impression, I would find the "under color of any statute" issue very close indeed. However, in *Classic* [1] and *Screws* [2] this Court considered a substantially identical statutory phrase to have a meaning which, unless we now retreat from it, requires that issue to go for the petitioners here.

From my point of view, the policy of *stare decisis*, as it should be applied in matters of statutory construction, and, to a lesser extent, the indications of congressional acceptance of this Court's earlier interpretation, require that it appear beyond doubt from the legislative history of the 1871 statute that *Classic* and *Screws* misapprehended the meaning of the controlling provision,[3] before a departure from what was decided in those cases would be justified. Since I can find no such justifying indication in that legislative history, I join the opinion of the Court. However, what has been written on both sides of the matter makes some additional observations appropriate.

---

[1] 313 U. S. 299.

[2] 325 U. S. 91.

[3] The provision is now found in 42 U. S. C. § 1983: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Those aspects of Congress' purpose which are quite clear in the earlier congressional debates, as quoted by my Brothers DOUGLAS and FRANKFURTER in turn, seem to me to be inherently ambiguous when applied to the case of an isolated abuse of state authority by an official. One can agree with the Court's opinion that:

"It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies. . . ."

without being certain that Congress meant to deal with anything other than abuses so recurrent as to amount to "custom, or usage." One can agree with my Brother FRANKFURTER, in dissent, that Congress had no intention of taking over the whole field of ordinary state torts and crimes, without being certain that the enacting Congress would not have regarded actions by an official, made possible by his position, as far more serious than an ordinary state tort, and therefore as a matter of federal concern. If attention is directed at the rare specific references to isolated abuses of state authority, one finds them neither so clear nor so disproportionately divided between favoring the positions of the majority or the dissent as to make either position seem plainly correct.[4]

Besides the inconclusiveness I find in the legislative history, it seems to me by no means evident that a posi-

---

[4] Compare Cong. Globe, 42d Cong., 1st Sess. 504 (Senator Pratt), and id., at App. 50 (Rep. Kerr), with Cong. Globe, 41st Cong., 2d Sess. 3663 (Senator Sherman), Cong. Globe, 42d Cong., 1st Sess. 697 (Senator Edmunds), id., at App. 68 (Rep. Shellabarger), and Cong. Globe, 39th Cong., 1st Sess. 1758 (Senator Trumbull).

tion favoring departure from *Classic* and *Screws* fits better that with which the enacting Congress was concerned than does the position the Court adopted 20 years ago. There are apparent incongruities in the view of the dissent which may be more easily reconciled in terms of the earlier holding in *Classic*.

The dissent considers that the "under color of" provision of § 1983 distinguishes between unconstitutional actions taken without state authority, which only the State should remedy, and unconstitutional actions authorized by the State, which the Federal Act was to reach. If so, then the controlling difference for the enacting legislature must have been either that the state remedy was more adequate for unauthorized actions than for authorized ones or that there was, in some sense, greater harm from unconstitutional actions authorized by the full panoply of state power and approval than from unconstitutional actions not so authorized or acquiesced in by the State. I find less than compelling the evidence that either distinction was important to that Congress.

## I.

If the state remedy was considered adequate when the official's unconstitutional act was unauthorized, why should it not be thought equally adequate when the unconstitutional act was authorized? For if one thing is very clear in the legislative history, it is that the Congress of 1871 was well aware that no action requiring state judicial enforcement could be taken in violation of the Fourteenth Amendment without that enforcement being declared void by this Court on direct review from the state courts. And presumably it must also have been understood that there would be Supreme Court review of the denial of a state damage remedy against an official on grounds of state authorization of the unconstitutional

action. It therefore seems to me that the same state remedies would, with ultimate aid of Supreme Court review, furnish identical relief in the two situations. This is the point Senator Blair made when, having stated that the object of the Fourteenth Amendment was to prevent any discrimination by the law of any State, he argued that:

"This being forbidden by the Constitution of the United States, and all the judges, State and national, being sworn to support the Constitution of the United States, and the Supreme Court of the United States having power to supervise and correct the action of the State courts when they violated the Constitution of the United States, there could be no danger of the violation of the right of citizens under color of the *laws* of the States." Cong. Globe, 42d Cong., 1st Sess., at App. 231.

Since the suggested narrow construction of § 1983 presupposes that state measures were adequate to remedy unauthorized deprivations of constitutional rights and since the identical state relief could be obtained for state-authorized acts with the aid of Supreme Court review, this narrow construction would reduce the statute to having merely a jurisdictional function, shifting the load of federal supervision from the Supreme Court to the lower courts and providing a federal tribunal for fact findings in cases involving authorized action. Such a function could be justified on various grounds. It could, for example, be argued that the state courts would be less willing to find a constitutional violation in cases involving "authorized action" and that therefore the victim of such action would bear a greater burden in that he would more likely have to carry his case to this Court, and once here, might be bound by unfavorable state court findings. But the legislative debates do not disclose con-

gressional concern about the burdens of litigation placed upon the victims of "authorized" constitutional violations contrasted to the victims of unauthorized violations. Neither did Congress indicate an interest in relieving the burden placed on this Court in reviewing such cases.

The statute becomes more than a jurisdictional provision only if one attributes to the enacting legislature the view that a deprivation of a constitutional right is significantly different from and more serious than a violation of a state right and therefore deserves a different remedy even though the same act may constitute both a state tort and the deprivation of a constitutional right. This view, by no means unrealistic as a common-sense matter,[5] is, I believe, more consistent with the flavor of the legislative history than is a view that the primary purpose of the statute was to grant a lower court forum for fact findings. For example, the tone is surely one of overflowing protection of constitutional rights, and there is not a hint of concern about the administrative burden on the Supreme Court, when Senator Frelinghuysen says:

"As to the civil remedies, for a violation of these privileges, we know that when the courts of a State

---

[5] There will be many cases in which the relief provided by the state to the victim of a use of state power which the state either did not or could not constitutionally authorize will be far less than what Congress may have thought would be fair reimbursement for deprivation of a constitutional right. I will venture only a few examples. There may be no damage remedy for the loss of voting rights or for the harm from psychological coercion leading to a confession. And what is the dollar value of the right to go to unsegregated schools? Even the remedy for such an unauthorized search and seizure as Monroe was allegedly subjected to may be only the nominal amount of damages to physical property allowable in an action for trespass to land. It would indeed be the purest coincidence if the state remedies for violations of common-law rights by private citizens were fully appropriate to redress those injuries which only a state official can cause and against which the Constitution provides protection.

violate the provisions of the Constitution or the law of the United States there is now relief afforded by a review in the Federal courts. And since the 14th Amendment forbids any State from making or enforcing any law abridging these privileges and immunities, as you cannot reach the Legislatures, the injured party should have an original action in our Federal courts, so that by injunction or by the recovery of damages he could have relief against the party who under color of such law is guilty of infringing his rights. As to the civil remedy no one, I think, can object." *Id.*, at 501.

And Senator Carpenter reflected a similar belief that the protection granted by the statute was to be very different from the relief available on review of state proceedings:

"The prohibition in the old Constitution that no State should pass a law impairing the obligation of contracts was a negative prohibition laid upon the State. Congress was not authorized to interfere in case the State violated that provision. It is true that when private rights were affected by such a State law, and that was brought before the judiciary, either of the State or nation, it was the duty of the court to pronounce the act void; but there the matter ended. Under the present Constitution, however, in regard to those rights which are secured by the fourteenth amendment, they are not left as the right of the citizen in regard to laws impairing the obligation of contracts was left, to be disposed of by the courts as the cases should arise between man and man, but Congress is clothed with the affirmative power and jurisdiction to correct the evil.

"I think there is one of the fundamental, one of the great, the tremendous revolutions effected in our Government by that article of the Constitution. It

gives Congress affirmative power to protect the rights of the citizen, whereas before no such right was given to save the citizen from the violation of any of his rights by State Legislatures, and the only remedy was a judicial one when the case arose." *Id.*, at 577.

In my view, these considerations put in serious doubt the conclusion that § 1983 was limited to state-authorized unconstitutional acts, on the premise that state remedies respecting them were considered less adequate than those available for unauthorized acts.

## II.

I think this limited interpretation of § 1983 fares no better when viewed from the other possible premise for it, namely that state-approved constitutional deprivations were considered more offensive than those not so approved. For one thing, the enacting Congress was not unaware of the fact that there was a substantial overlap between the protections granted by state constitutional provisions and those granted by the Fourteenth Amendment. Indeed one opponent of the bill, Senator Trumbull, went so far as to state in a debate with Senators Carpenter and Edmunds that his research indicated a complete overlap in every State, at least as to the protections of the Due Process Clause.[6] Thus, in one very significant sense, there was no ultimate state approval of a large portion of otherwise authorized actions depriving a person of due-process rights. I hesitate to assume that the proponents of the present statute, who regarded it as necessary even though they knew that the provisions of the Fourteenth Amendment were self-executing, would have thought the remedies unnecessary whenever there were self-executing provisions of state constitutions also forbidding what the Fourteenth Amendment forbids. The only alternative is

---

[6] *Id.*, at 577.

to disregard the possibility that a state court would find the action unauthorized on grounds of the state constitution. But if the defendant official is denied the right to defend in the federal court upon the ground that a state court would find his action unauthorized in the light of the state constitution, it is difficult to contend that it is the added harmfulness of state approval that justifies a different remedy for authorized than for unauthorized actions of state officers. Moreover, if indeed the legislature meant to distinguish between authorized and unauthorized acts and yet did not mean the statute to be inapplicable whenever there was a state constitutional provision which, reasonably interpreted, gave protection similar to that of a provision of the Fourteenth Amendment, would there not have been some explanation of this exception to the general rule? The fact that there is none in the legislative history at least makes more difficult a contention that these legislators were in fact making a distinction between use and misuse of state power.

There is a further basis for doubt that it was the additional force of state approval which justified a distinction between authorized and unauthorized actions. No one suggests that there is a difference in the showing the plaintiff must make to assert a claim under § 1983 depending upon whether he is asserting a denial of rights secured by the Equal Protection Clause or a denial of rights secured by the Due Process Clause of the Fourteenth Amendment. If the same Congress which passed what is now § 1983 also provided remedies against two or more non-officials who conspire to prevent an official from granting equal protection of the laws, see 42 U. S. C. § 1985, then it would seem almost untenable to insist that this Congress would have hesitated, on the grounds of lack of full state approval of the official's act, to provide similar remedies against an official who, unauthorized, denied that equal protection of the laws on his own initiative. For

there would be no likely state approval of or even acquiescence in a conspiracy to coerce a state official to deny equal protection. Indeed it is difficult to attribute to a Congress which forbad two private citizens from hindering an official's giving of equal protection an intent to leave that official free to deny equal protection of his own accord.[7]

We have not passed upon the question whether 42 U. S. C. § 1985,[8] which was passed as the second section of the Act that included § 1983, was intended to reach only the Ku Klux Klan or other substantially organized group activity, as distinguished from what its words seem to include, any conspiracy of two persons with "the purpose of preventing or hindering the constituted authorities of any State . . . from giving or securing to all persons within such State . . . the equal protection of the laws . . . ." [9] Without now deciding the question, I think

---

[7] Compare the statement of Representative Burchard:
"If the refusal of a State officer, acting for the State, to accord equality of civil rights renders him amenable to punishment for the offense under United States law, conspirators who attempt to prevent such officers from performing such duty are also clearly liable." Cong. Globe, 42d Cong., 1st Sess., App. 315.

[8] Section 2 as finally adopted was substantially as now provided in 42 U. S. C. § 1985: "If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State . . . from giving or securing to all persons within such State . . . the equal protection of the laws; [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

[9] I do not think that this Court's decision in Collins v. Hardyman, 341 U. S. 651, can properly be viewed as determining the scope of

it is sufficient to note that the legislative history is not without indications that what the words of the statute seem to state was in fact the meaning assumed by Congress.[10]

the provision of § 1985 which refers to conspiring "for the purpose of preventing . . . the constituted authorities ·of any State . . . from giving . . . the equal protection of the laws . . . ." Not only did the Court specifically disclaim any consideration of this provision, but it proceeded to emphasize that the petitioners therein had only been subjected to a private discrimination since "There is not the slightest allegation that defendants were conscious of or trying to influence the law, or were endeavoring to obstruct or interfere with it." 341 U. S., at 661. The holding that the equal protection of the law is unaffected by discriminatorily motivated violations of state law so long as the instrumentalities of law enforcement remain free, able, and willing to remedy these violations is clearly based upon premises which cannot control the quite dissimilar case of a conspiratorial attempt to affect the fairness of these instrumentalities, "the constituted authorities of any State."

[10] Representative Poland, who had doubted the constitutionality of the earlier forms of § 2, had no such doubts about its present form. His reading of the provision is clear from his defense of it:

"But I do agree that if a State shall deny the equal protection of the laws, or if a State make proper laws and have proper officers to enforce those laws, and somebody undertakes to step in and clog justice by preventing the State authorities from carrying out this constitutional provision, then I do claim that we have the right to make such interference an offense against the United States; that the Constitution does empower us to aid in carrying out this injunction, which, by the Constitution, we have laid upon the States, that they shall afford the equal protection of the laws to all their citizens. When the State has provided the law, and has provided the officer to carry out the law, then we have the right to say that anybody who undertakes to·interfere and prevent the execution of that State law is amenable to this provision of the Constitution, and to the law that we may make under it declaring it to be an offense against the United States." *Id.*, at 514.

An opponent of the provision was, if anything, even clearer in expressing his understanding of the coverage of the provision:

". . . It does not require that the combination shall be one that the State cannot put down; it does not require that it shall amount to

These difficulties in explaining the basis of a distinction between authorized and unauthorized deprivations of constitutional rights fortify my view that the legislative history does not bear the burden which *stare decisis* casts upon it. For this reason and for those stated in the opinion of the Court, I agree that we should not now depart from the holdings of the *Classic* and *Screws* cases.

MR. JUSTICE FRANKFURTER, dissenting except insofar as the Court holds that this action cannot be maintained against the City of Chicago.

Abstractly stated, this case concerns a matter of statutory construction. So stated, the problem before the Court is denuded of illuminating concreteness and thereby of its far-reaching significance for our federal system. Again abstractly stated, this matter of statutory construction is one upon which the Court has already passed. But it has done so under circumstances and in settings that negative those considerations of social policy upon which the doctrine of *stare decisis,* calling for the controlling application of prior statutory construction, rests.

This case presents the question of the sufficiency of petitioners' complaint in a civil action for damages brought under the Civil Rights Act, R. S. § 1979,

anything like insurrection. If three persons combine for the purpose of preventing or hindering the constituted authorities of any State from extending to all persons the equal protection of the laws, although those persons may be taken by the first sheriff who can catch them or the first constable, although every citizen in the country may be ready to aid as a *posse,* yet this statute applies. It is no case of domestic violence, no case of insurrection, and no case, therefore, for the interference of the Federal Government, much less its interference where there is no call made upon it by the Governor or the Legislature of the State." *Id.,* at App. 218 (Senator Thurman); see also *id.,* at 514 (Rep. Farnsworth).

42 U. S. C. § 1983.[1] The complaint alleges that on October 29, 1958, at 5:45 a. m., thirteen Chicago police officers, led by Deputy Chief of Detectives Pape, broke through two doors of the Monroe apartment, woke the Monroe couple with flashlights, and forced them at gunpoint to leave their bed and stand naked in the center of the living room; that the officers roused the six Monroe children and herded them into the living room; that Detective Pape struck Mr. Monroe several times with his flashlight, calling him "nigger" and "black boy"; that another officer pushed Mrs. Monroe; that other officers hit and kicked several of the children and pushed them to the floor; that the police ransacked every room, throwing clothing from closets to the floor, dumping drawers, ripping mattress covers; that Mr. Monroe was then taken to the police station and detained on "open" charges for ten hours, during which time he was interrogated about a murder[2] and exhibited in lineups; that he was not brought before a magistrate, although numerous magistrate's courts were accessible; that he was not advised of his procedural rights; that he was not permitted to call his family or an attorney; that he was subsequently released without criminal charges having been filed against him. It is also alleged that the actions of the officers throughout were without authority of a search warrant or an arrest warrant; that those actions constituted arbitrary and unreasonable conduct; that the

---

[1] The complaint is in nine counts, and seeks to assert a claim in favor of Mr. Monroe, Mrs. Monroe, and their children, respectively, under each of R. S. §§ 1979, 1980 and 1981, 42 U. S. C. §§ 1983, 1985 and 1986. Petitioners have abandoned in this Court their claims under §§ 1980 and 1981, and we are not now asked to determine the applicability of those sections to the facts alleged.

[2] The murder was asserted by the examining officers to have been committed two days before, on October 27.

officers were employees of the City of Chicago, which furnished each of them with a badge and an identification card designating him as a member of the Police Department; that the officers were agents of the city, acting in the course of their employment and engaged in the performance of their duties; and that it is the custom of the Department to arrest and confine individuals for prolonged periods on "open" charges for interrogation, with the purpose of inducing incriminating statements, exhibiting its prisoners for identification, holding them *incommunicado* while police officers investigate their activities, and punishing them by imprisonment without judicial trial.   On the basis of these allegations various members of the Monroe family seek damages against the individual police officers and against the City of Chicago.   The District Court dismissed the complaint for failure to state a claim and the Court of Appeals for the Seventh Circuit affirmed.   272 F. 2d 365.

Petitioners base their claim to relief in the federal courts on what was enacted as § 1 of the "Ku Klux Act" of April 20, 1871, "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes."   17 Stat. 13.   It became, with insignificant rephrasing, § 1979 of the Revised Statutes.   As now set forth in 42 U. S. C. § 1983, it is, in relevant part, as follows:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

## I.

In invoking § 1979 (the old designation will be used hereafter), petitioners contend that its protection of "rights, privileges, or immunities secured by the Constitution" encompasses what "due process of law" and "the equal protection of the laws" of the Fourteenth Amendment guarantee against action by the States. In this contention they are supported both by the title of the Act of 1871 and by its legislative history. See the authoritative statement of Mr. Edmunds, reporting the bill from the Senate Committee on the Judiciary, Cong. Globe, 42d Cong., 1st Sess. 568. See also *id.*, at 332–334, App. 83–85, 310. It is true that a related phrase, "any right or privilege secured . . . by the Constitution or laws," in § 241 of Title 18, U. S. C., was said by a plurality of the Court in *United States* v. *Williams,* 341 U. S. 70, to comprehend only the rights arising immediately from the relationship of the individual to the central government. And see *United States* v. *Cruikshank,* 92 U. S. 542.[3] But this construction was demanded by § 241, which penalizes conspiracies of private individuals acting as such, while § 1979 applies only to action taken "under color of any statute," etc. Different problems of statutory meaning are presented by two enactments deriving from different

---

[3] Drawing upon the reasoning of the *Slaughter-House Cases,* 16 Wall. 36, this decision determined that only those rights or privileges were secured by the Constitution and laws which were inherent in the status of the individual as a citizen of the National Government, see *Ex parte Yarbrough,* 110 U. S. 651, *Guinn* v. *United States,* 238 U. S. 347, or which were necessary to the integrity of the federal governmental institution, see *Motes* v. *United States,* 178 U. S. 458; compare *Logan* v. *United States,* 144 U. S. 263, with *United States* v. *Powell,* 212 U. S. 564, or which were created by Congress in the legitimate exercise of its Article I powers, see *United States* v. *Waddell,* 112 U. S. 76.

constitutional sources. See the *Civil Rights Cases,* 109 U. S. 3. Compare *United States* v. *Williams, supra,* with *Screws* v. *United States,* 325 U. S. 91. If petitioners have alleged facts constituting a deprivation under color of state authority of a right assured them by the Fourteenth Amendment, they have brought themselves within § 1979. *Douglas* v. *Jeannette,* 319 U. S. 157; *Hague* v. *C. I. O.,* 307 U. S. 496, 525–526 (opinion of Stone, J.).[4]

To be sure, *Screws* v. *United States, supra,* requires a finding of specific intent in order to sustain a conviction under the cognate penal provisions of 18 U. S. C. § 242 [5]—"an intent to·deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." 325 U. S., at 104. Petitioners' complaint here alleges no such specific intent. But, for a number of reasons, this requirement of *Screws* should not be carried over and applied to civil actions under § 1979. First, the word "willfully" in 18 U. S. C. § 242 from which the requirement of intent was derived in *Screws* does not appear in § 1979. Second, § 1979, by the very fact that it is a civil provision, invites treatment different from that to be given its criminal analogue. The constitutional scruples concerning vagueness which were deemed to compel the *Screws* construction have less force in the context of a civil proceed-

---

[4] It was brought to the attention of Congress in 1871 that "rights, privileges, or immunities" was a more extensive phrase than "privileges or immunities" as used in the Fourteenth Amendment prohibiting a State from abridging "the privileges or immunities of citizens of the United States." Cong. Globe, 42d Cong., 1st Sess., App. 49–50.

[5] "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined not more than $1,000 or imprisoned not more than one year, or both."

ing,[6] and § 1979, insofar as it creates an action for damages, must be read in light of the familiar basis of tort liability that a man is responsible for the natural consequences of his acts. Third, even in the criminal area, the specific intent demanded by *Screws* has proved to be an abstraction serving the purposes of a constitutional need without impressing any actual restrictions upon the nature of the crime which the jury tries. The *Screws* opinion itself said that "The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution." 325 U. S., at 106. And lower courts in applying the statute have allowed inference of the requisite specific intent from evidence, it would appear, of malevolence alone.[7] But if intent to infringe "specific" constitutional rights comes in practice to mean no more than intent without justification to bring about the circumstances which infringe those rights, then the consequence of introducing the specific intent issue into a litigation is, in effect, to require fictional pleading, needlessly burden jurors with abstruse instructions, and lessen the degree of control which federal courts have over jury vagaries.

If the courts are to enforce § 1979, it is an unhappy form of judicial disapproval to surround it with doctrines which partially and unequally obstruct its operation. Specific intent in the context of the section would cause

---

[6] Civil liability has always been drawn from such indefinite standards as reasonable care, a man of ordinary prudence, foreseeability, etc. And see *Baltimore & Ohio R. Co.* v. *Groeger,* 266 U. S. 521; *Miller* v. *Strahl,* 239 U. S. 426.

[7] See *Koehler* v. *United States,* 189 F. 2d 711 (C. A. 5th Cir.); *Clark* v. *United States,* 193 F. 2d 294 (C. A. 5th Cir.); *Crews* v. *United States,* 160 F. 2d 746 (C. A. 5th Cir.). These cases are not cited by way of approval.

such embarrassment without countervailing justification. Petitioners' allegations that respondents in fact did the acts which constituted violations of constitutional rights are sufficient.

## II.

To show such violations, petitioners invoke primarily the Amendment's Due Process Clause.[8] The essence of their claim is that the police conduct here alleged offends those requirements of decency and fairness which, because they are "implicit in the concept of ordered liberty," are imposed by the Due Process Clause upon the States. *Palko* v. *Connecticut*, 302 U. S. 319, 325. When we apply to their complaint that standard of a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,"[9] which has been the touchstone for this Court's enforcement of due process,[10] the merit of this constitutional claim is evident. The conception expressed in *Wolf* v. *Colorado,* 338 U. S. 25, 27, that "The security of one's privacy against arbitrary intrusion by the police . . . is basic to a free society," was not an innovation of *Wolf*. The tenet that there exists a realm of sanctuary surrounding every individual and infrangible, save in a very limited class of circumstances, by the agents of government, had informed the decision of the King's Bench two centuries earlier in *Entick* v. *Carrington,* 2 Wils. 275, had been the basis of Otis' cotemporary speech against the Writ of

---

[8] Petitioners also rely on the Equal Protection Clause. The disposition of the litigation by the majority here makes it unnecessary to discuss this aspect of the case.

[9] *Snyder* v. *Massachusetts,* 291 U. S. 97, 105.

[10] See *Twining* v. *New Jersey,* 211 U. S. 78; *Powell* v. *Alabama,* 287 U. S. 45; *Palko* v. *Connecticut,* 302 U. S. 319; *Betts* v. *Brady,* 316 U. S. 455; *Gibbs* v. *Burke,* 337 U. S. 773; *Rochin* v. *California,* 342 U. S. 165.

Assistance, see Gray's notes in Quincy's Massachusetts Reports, App. I, at 471; Tudor, Life of James Otis (1823) 63, and has in the intervening years found expression not only in the Fourth Amendment to the Constitution of the United States, but also in the fundamental law of every State.[11] Modern totalitarianisms have been a stark reminder, but did not newly teach, that the kicked-in door is the symbol of a rule of fear and violence fatal to institutions founded on respect for the integrity of man.

The essence of the liberty protected by the common law and by the American constitutions was "the right to shut the door on officials of the state unless their entry is under proper authority of law"; particularly, "the right to resist unauthorized entry which has as its design the securing of information to fortify the coercive power of the state against the individual." *Frank* v. *Maryland*, 359 U. S.

---

[11] Ala. Const., Art. I, § 5; Alaska Const., Art. I, § 14; Ariz. Const., Art. II, § 8; Ark. Const., Art. II, § 15; Cal. Const., Art. I, § 19; Colo. Const., Art. II, § 7; Conn. Const., Art. I, § 8; Del. Const., Art. I, § 6; Fla. Const., Declaration of Rights, § 22; Ga. Const., Art. I, § 2–116; Hawaii Const., Art. I, § 5; Idaho Const., Art. I, § 17; Ill. Const., Art. II, § 6; Ind. Const., Art. I, § 11; Iowa Const., Art. I, § 8; Kan. Const., Bill of Rights, § 15; Ky. Const., Bill of Rights, § 10; La. Const., Art. 1, § 7; Me. Const., Art. I, § 5; Md. Const., Declaration of Rights, Art. 26; Mass. Const., Pt. I, Art. XIV; Mich. Const., Art. II, § 10; Minn. Const., Art. I, § 10; Miss. Const.; Art. 3, § 23; Mo. Const., Art. I, § 15; Mont. Const., Art. III, § 7; Neb. Const., Art. I, § 7; Nev. Const., Art. I, § 18; N. H. Const., Pt. I, Art. 19; N. J. Const., Art. I, par. 7; N. M. Const., Art. II, § 10; N. Y. Const., Art. I, § 12, and Civil Rights Law, § 8; N. C. Const., Art. I, § 15; N. D. Const., Art. I, § 18; Ohio Const., Art. I, § 14; Okla. Const., Art. II, § 30; Ore. Const., Art. I, § 9; Pa. Const., Art. I, § 8; R. I. Const., Art. I, § 6; S. C. Const., Art. I, § 16; S. D. Const., Art. VI, § 11; Tenn. Const., Art. I, § 7; Tex. Const., Art. I, § 9; Utah Const., Art. I, § 14; Vt. Const., C. I, Art. 11; Va. Const., Art. I, § 10; Wash. Const., Art. I, §7; W. Va. Const., Art. III, § 6; Wis. Const., Art. I, § 11; Wyo. Const., Art. I, § 4.

360, 365.[12]   Searches of the dwelling house were the special object of this universal condemnation of official intrusion.[13]   Night-time search was the evil in its most obnoxious form.[14]   Few reported cases have presented all of the manifold aggravating circumstances which petitioners here allege—intrusion *en masse,* by dark, by force, unauthorized by warrant, into an occupied private home, without even the asserted justification of belief by the intruders that the inhabitants were presently committing some criminal act within; physical abuse and the calculated degradation of insult and forced nakedness; sacking and disordering of personal effects throughout the home; arrest and detention against the background terror of threatened criminal proceedings.   Wherever similar conduct has appeared, the courts have unanimously condemned police entries as lawless.[15]

---

[12] See *Huckle* v. *Money,* 2 Wils. 205; *Wilkes* v. *Wood,* 19 How. St. Tr. 1153; *Bessemer* v. *Eidge,* 162 Ala. 201, 50 So. 270; 1 Cooley's Constitutional Limitations (8th ed. 1927) 610–615; Fraenkel, Concerning Searches and Seizures, 34 Harv. L. Rev. 361 (1921), containing a collection of authorities.

[13] See, *e. g., Thurman* v. *State,* 116 Fla. 426, 156 So. 484; compare *Simpson* v. *State,* 152 Tex. Cr. R. 481, 215 S. W. 2d 617, with *McClannan* v. *Chaplain,* 136 Va. 1, 15–17, 116 S. E. 495.   Note the common legislative proscription upon the search of private homes by officers otherwise authorized to make entries for the enforcement of prohibition laws and other regulatory statutes.   *E. g.,* National Prohibition Act, tit. II, § 25, 41 Stat. 305, 315; and see Cornelius, Search and Seizure (2d ed. 1930), §§ 135–144.

[14] See 2 Hale, Pleas of the Crown (Wilson ed. 1800) 150.

[15] See, *e. g., People* v. *Cahan,* 44 Cal. 2d 434, 282 P. 2d 905 (1955) ; *Sarafini* v. *San Francisco,* 143 Cal. App. 2d 570, 300 P. 2d 44 (1956) ; *Ware* v. *Dunn,* 80 Cal. App. 2d 936, 183 P. 2d 128 (1947) ; *Walker* v. *Whittle,* 83 Ga. App. 445, 64 S. E. 2d 87 (1951) ; *People* v. *Dalpe,* 371 Ill. 607, 21 N. E. 2d 756 (1939) ; *Hart* v. *State,* 195 Ind. 384, 145 N. E. 492 (1924) ; *Johnson* v. *Commonwealth,* 296 S. W. 2d 210 (Ky. App. 1956) ; *Deaderick* v. *Smith,* 33 Tenn. App. 151, 230 S. W. 2d 406 (1950).

If the question whether due process forbids this kind of police invasion were before us in isolation, the answer would be quick. If, for example, petitioners had sought damages in the state courts of Illinois and if those courts had refused redress on the ground that the official character of the respondents clothed them with civil immunity, we would be faced with the sort of situation to which the language in the *Wolf* opinion was addressed: "we have no hesitation in saying that were a State affirmatively to sanction such police incursion into privacy it would run counter to the guaranty of the Fourteenth Amendment." 338 U. S., at 28. If that issue is not reached in this case it is not because the conduct which the record here presents can be condoned. But by bringing their action in a Federal District Court petitioners cannot rest on the Fourteenth Amendment *simpliciter*. They invoke the protection of a specific statute by which Congress restricted federal judicial enforcement of its guarantees to particular enumerated circumstances. They must show not only that their constitutional rights have been infringed, but that they have been infringed "under color of [state] statute, ordinance, regulation, custom, or usage," as that phrase is used in the relevant congressional enactment.

### III.

Of course, if Congress by appropriate statutory language attempted to reach every act which could be attributed to the States under the Fourteenth Amendment's prohibition: "No State shall . . . ," the reach of the statute would be the reach of the Amendment itself. Relevant to the enforcement of such a statute would be not only the concept of state action as this Court has developed it, see *Nixon* v. *Condon,* 286 U. S. 73, 89, but also considerations of the power of Congress, under the Amendment's Enforcement Clause, to determine what

is "appropriate legislation" to protect the rights which the Fourteenth Amendment secures. Cf. *United States v. Raines,* 362 U. S. 17. Still, in this supposed case we would arrive at the question of what Congress could do only after we had determined what it was that Congress had done. So, in the case before us now, we must ask what Congress did in 1871. We must determine what Congress meant by "under color" of enumerated state authority.[16]

Congress used that phrase not only in R. S. § 1979, but also in the criminal provisions of § 2 of the First Civil Rights Act of April 9, 1866, 14 Stat. 27, from which is derived the present 18 U. S. C. § 242,[17] and in both cases used it with the same purpose.[18] During the seventy years

---

[16] The various analyses which have enabled this Court to find state action in situations other than that presented by *Barney* v. *New York,* 193 U. S. 430, are plainly not appropriate to consideration of the question whether in a given instance official conduct is "under color" of state law. *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362, and *Iowa-Des Moines Nat'l Bank* v. *Bennett,* 284 U. S. 239, came here on certiorari from state court proceedings. *Coulter* v. *Louisville & Nashville R. Co.,* 196 U. S. 599, and *Raymond* v. *Chicago Traction Co.,* 207 U. S. 20, held that accepted administrative usage in the exercise of a power specifically conferred by state legislation and wholly dependent upon that legislation for its coercive effects might constitute such action of a State as to present a cognizable federal question. But see *Memphis* v. *Cumberland Tel. & Tel. Co.,* 218 U. S. 624. Similarly, *Home Tel. & Tel. Co.* v. *Los Angeles,* 227 U. S. 278, held that the existence in a state constitution of provisions coincident with those of the Federal Constitution did not *ipso facto* immunize state officials from the original jurisdiction of the federal courts. From none of these cases is implication to be drawn pertinent to the interpretation of § 1979.

[17] See note 5, *supra.*

[18] Mr. Shellabarger, Chairman of the House Select Committee which authored the Act of April 20, 1871, whose first section is now § 1979, reported to the House that that section was modeled upon the second section of the Act of April 9, 1866, 14 Stat. 27, and that the two sections were intended to cover the same cases, with qualifica-

which followed these enactments, cases in this Court in which the "under color" provisions were invoked uniformly involved action taken either in strict pursuance of some specific command of state law [19] or within the scope of executive discretion in the administration of state laws.[20]

tions not relevant here. Cong. Globe, 42d Cong., 1st Sess., App. 68. See also *id.*, at 461. The 1866 provision had been re-enacted, substantially and in form, by the seventeenth and eighteenth sections of the Act of May 31, 1870, 16 Stat. 140, 144, and the 1874 revision of the provision was in turn patterned on the present § 1979. See *Screws* v. *United States,* 325 U. S. 91, 99–100. The sections have consistently been read as coextensive in their reach of acts "under color" of state authority. *Picking* v. *Pennsylvania R. Co.,* 151 F. 2d 240, 248 (C. A. 3d Cir.) ; *Burt* v. *City of New York,* 156 F. 2d 791, 792 (C. A. 2d Cir.) ; *McShane* v. *Moldovan,* 172 F. 2d 1016, 1020 (C. A. 6th Cir.) ; *Geach* v. *Moynahan,* 207 F. 2d 714, 717 (C. A. 7th Cir.).

As enacted in 1871, the provision which is now § 1979 reached acts taken "under color of any *law,* statute, ordinance, regulation, custom, or usage of any State . . . ." 17 Stat. 13. (Emphasis added.) In the Revised Statutes of 1874 and 1878 "law" was omitted from the section, although "law" was retained in the parallel criminal provision, R. S. § 5510, as amended, 18 U. S. C. § 242, and in the jurisdictional provisions, R. S. §§ 563 (12) and 629 (16). The deletion in § 1979 appears in the Reviser's Draft (1872) without explanation. 1 Revision of U. S. Statutes, Draft (1872) 947. No alteration in statutory coverage is permissibly to be based upon the change.

The jurisdictional provisions may now be found in 28 U. S. C. § 1343.

[19] *Carter* v. *Greenhow,* 114 U. S. 317; *Bowman* v. *Chicago & N. W. Ry. Co.,* 115 U. S. 611; *Giles* v. *Harris,* 189 U. S. 475; *Devine* v. *Los Angeles,* 202 U. S. 313; *Myers* v. *Anderson,* 238 U. S. 368; *Nixon* v. *Herndon,* 273 U. S. 536; *Lane* v. *Wilson,* 307 U. S. 268; *Douglas* v. *Jeannette,* 319 U. S. 157. One case not involving a state constitution, statute, or ordinance was an instance of state *judicial* action. *Green* v. *Elbert,* 137 U. S. 615; and see *Anglo-American Prov. Co.* v. *Davis Prov. Co., No. 2,* 191 U. S. 376.

[20] *Holt* v. *Indiana Mfg. Co.,* 176 U. S. 68; *Moyer* v. *Peabody,* 212 U. S. 78; *Hague* v. *C. I. O.,* 307 U. S. 496; cf. *Smith* v. *Allwright,* 321 U. S. 649.

214

The same is true, with two exceptions, in the lower federal courts.[21]   In the first of these two cases it was held that § 1979 was not directed to instances of lawless police brutality, although the ruling was not put on "under color"

[21] *Northwestern Fertilizing Co.* v. *Hyde Park,* 18 Fed. Cas. 393, No. 10,336 (C. C. N. D. Ill. 1873); *Baltimore & Ohio R. Co.* v. *Allen,* 17 F. 171 (C. C. W. D. Va. 1883); *Tuchman* v. *Welch,* 42 F. 548, and *M. Schandler Bottling Co.* v. *Welch,* 42 F. 561 (C. C. D. Kan. 1890); *Hemsley* v. *Myers,* 45 F. 283 (C. C. D. Kan. 1891); *Davenport* v. *Cloverport,* 72 F. 689 (D. C. D. Ky. 1896); *Fraser* v. *McConway & Torley Co.,* 82 F. 257 (C. C. D. Pa. 1897); *Crystal Springs Land & Water Co.* v. *Los Angeles,* 76 F. 148 (C. C. S. D. Cal. 1896), aff'd, 177 U. S. 169 (see *California Oil & Gas Co.* v. *Miller,* 96 F. 12 (C. C. S. D. Cal. 1899)); *Aultman & Taylor Co.* v. *Brumfield,* 102 F. 7 (C. C. N. D. Ohio 1900), app. dism'd 22 S. Ct. 938; *Wadleigh* v. *Newhall,* 136 F. 941 (C. C. N. D. Cal. 1905); *Farson* v. *City of Chicago,* 138 F. 184 (C. C. N. D. Ill. 1905); *Brickhouse* v. *Brooks,* 165 F. 534 (C. C. E. D. Va. 1908); *Simpson* v. *Geary,* 204 F. 507 (D. C. D. Ariz. 1913); *Raich* v. *Truax,* 219 F. 273 (D. C. D. Ariz. 1915), aff'd, 239 U. S. 33; *Marcus Brown Holding Co.* v. *Pollak,* 272 F. 137 (D. C. S. D. N. Y. 1920); *West* v. *Bliley,* 33 F. 2d 177 (D. C. E. D. Va. 1929), aff'd, 42 F. 2d 101 (C. A. 4th Cir. 1930); *Trudeau* v. *Barnes,* 65 F. 2d 563 (C. A. 5th Cir. 1933); *Jones* v. *Oklahoma City,* 78 F. 2d 860 (C. A. 10th Cir. 1935); *Mitchell* v. *Greenough,* 100 F. 2d 184 (C. A. 9th Cir. 1938); *Blackman* v. *Stone,* 101 F. 2d 500 (C. A. 7th Cir. 1939); *City of Manchester* v. *Leiby,* 117 F. 2d 661 (C. A. 1st Cir. 1941); *Hannan* v. *City of Haverhill,* 120 F. 2d 87 (C. A. 1st Cir. 1941); *Hume* v. *Mahan,* 1 F. Supp. 142 (D. C. E. D. Ky. 1932), rev'd, 287 U. S. 575; *Premier-Pabst Sales Co.* v. *McNutt,* 17 F. Supp. 708 (D. C. S. D. Ind. 1935); *Gobitis* v. *Minersville School Dist.,* 21 F. Supp. 581 (D. C. E. D. Pa. 1937), 24 F. Supp. 271 (1938), aff'd, 108 F. 2d 683 (C. A. 3d Cir. 1939), rev'd, 310 U. S. 586; *Connor* v. *Rivers,* 25 F. Supp. 937 (D. C. N. D. Ga. 1938), aff'd, 305 U. S. 576; *Ghadiali* v. *Delaware State Medical Society,* 28 F. Supp. 841 (D. C. D. Del. 1939); *Mills* v. *Board of Education,* 30 F. Supp. 245 (D. C. D. Md. 1939); *Bluford* v. *Canada,* 32 F. Supp. 707 (D. C. W. D. Mo. 1940), app. dism'd, 119 F. 2d 779 (C. A. 8th Cir. 1941); *Kennedy* v. *City of Moscow,* 39 F. Supp. 26 (D. C. D. Idaho 1941).  In these cases R. S. § 1979 or the parallel jurisdictional provisions were invoked. Note that in the *Jones* and *Farson* cases, *supra,* defendant's conduct

grounds.[22]   In the second, an indictment charging a
county tax collector with depriving one Ah Koo of a feder-
ally secured right under color of a designated California
law, set forth in the indictment, was held insufficient
against a demurrer.   *United States* v. *Jackson,* 26 Fed.
Cas. 563, No. 15,459 (C. C. D. Cal. 1874).   The court
wrote:

> "The indictment contains no averment that Ah Koo
> was a foreign miner, and within the provisions of the
> state law.   If this averment be unnecessary . . . the
> act of congress would then be held to apply to a case
> of illegal extortion by a tax collector from any person,

was specifically authorized by local ordinance, although plaintiffs
asserted the invalidity of those ordinances under state as well as
under federal law.   In both cases relief was denied on the ground
that no state action was shown, within the rule of *Barney* v. *New
York,* 193 U. S. 430.   To this group of cases involving acts author-
ized by state law must be added *Miller* v. *Rivers,* 31 F. Supp. 540
(D. C. M. D. Ga. 1940), rev'd as moot, 112 F. 2d 439 (C. A. 5th Cir.
1940), in which a state governor had several times authorized action
in violation of state court restraining orders, finally declaring martial
law in the face of the state judicial decrees.   Two reported criminal
prosecutions under § 242 also involved conduct sanctioned by state
law.   *United States* v. *Buntin,* 10 F. 730 (C. C. S. D. Ohio 1882);
*United States* v. *Stone,* 188 F. 836 (D. Md. 1911).   Cf. *United States*
v. *Horton,* 26 Fed. Cas. 375, No. 15,392 (D. Ala. 1867), *semble.*

[22] *Brawner* v. *Irvin,* 169 F. 964 (C. C. N. D. Ga. 1909).   In one
case decided in 1940 just prior to *United States* v. *Classic,* 313 U. S.
299, a Federal District Court did distinctly decide that similar police
misconduct unauthorized by state law, was "under color" of state
law.   *United States* v. *Sutherland,* 37 F. Supp. 344 (D. C. N. D.
Ga. 1940).   An unreported 1940 case, *United States* v. *Cowan* (D. C.
E. D. La.), is said to have reached a similar result.   See 1941 Atty.
Gen. Rep. 98; Brief for the United States; *United States* v. *Classic,*
313 U. S. 299, p. 45, n. 25.   In neither of these two cases does there
appear to have been any examination of the legislative history of the
"under color" statutes, nor is any reasoning offered to support the
conclusion of the courts.

though such exaction might be wholly unauthorized by the law under which the officer pretended to act.

"We are satisfied that it was not the design of congress to prevent or to punish such abuse of authority by state officers. The object of the act was, not to prevent illegal exactions, but to forbid the execution of state laws, which, by the act itself, are made void. . . .

"It would seem, necessarily, to follow, that the person from whom the tax was exacted must have been a person from whom, under the provisions of the state law, the officer was authorized to exact it. The statute requires that a party shall be subjected to a deprivation of right secured by the statute under color of some law, statute, order or custom; but if this exaction, although made by a tax collector, has been levied upon a person not within the provisions of the state law, the exaction cannot be said to have been made 'under color of law,' any more than a similar exaction from a Chinese miner, made by a person wholly unauthorized, and under the pretense of being a tax collector." *Id.*, at 563–564.

Throughout this period, the only indication of this Court's views on the proper interpretation of the "under color" language is a dictum in the *Civil Rights Cases,* 109 U. S. 3. There, in striking down other Civil Rights Act provisions which, as the Court regarded them, attempted to reach private conduct not attributable to state authority, Mr. Justice Bradley contrasted those provisions with § 2 of the Act of 1866: "This [latter] law is clearly corrective in its character, intended to counteract and furnish redress against State laws and proceedings, and customs having the force of law, which sanction the wrongful acts specified." *Id.*, at 16.

A sharp change from this uniform application of seventy years was made in 1941, but without acknowledgment or

indication of awareness of the revolutionary turnabout from what had been established practice. The opinion in *United States* v. *Classic,* 313 U. S. 299, accomplished this. The case presented an indictment under § 242 charging certain local Commissioners of Elections with altering ballots cast in a primary held to nominate candidates for Congress. Sustaining the sufficiency of the indictment in an extensive opinion concerned principally with the question whether the right to vote in such a primary was a right secured by the Constitution,[23] Mr. Justice Stone wrote that the alteration of the ballots was "under color" of state law. This holding was summarily announced without exposition; it had been only passingly argued.[24] Of the three authorities cited to support it, two did not involve the "under color" statutes,[25] and the third, *Hague* v. *C. I. O.,* 307 U. S. 496, was a case in which high-ranking municipal officials claimed authorization for their actions under municipal ordinances (here held unconstitu-

---

[23] The court below had dismissed the indictment on the ground that the right was not so secured and had not discussed the "under color" issue. 35 F. Supp. 66.

[24] The Government's brief contended that, inasmuch as the Civil Rights statutes were passed to enforce the Fourteenth Amendment, they should be read as coextensive with it: "under color" of state law should be coincident with "State action" as this Court had developed the "State action" concept. Classic's brief argued the point as though it were urging a "State action" contention.

[25] *Ex parte Virginia,* 100 U. S. 339, arose under federal legislation penalizing "any officer or other person charged with any duty in the selection or summoning of jurors" who discriminated on grounds of race, color, or previous condition of servitude in the choosing of juries. The issue was whether this provision could constitutionally be applied to a state judge who discriminated in the administration of a state statute fair on its face. *Home Tel. & Tel. Co.* v. *Los Angeles,* 227 U. S. 278, posed the question whether the enforcement of an allegedly confiscatory municipal regulatory ordinance was state action for purposes of Federal District Court "arising under" jurisdiction.

tional) and under the general police powers of the State.[26] All three of these cases had dealt with "State action" problems, and it is "State action," not the very different question of the "under color" clause, that Mr. Justice Stone appears to have considered.[27] (I joined in this opinion without having made an independent examination of the legislative history of the relevant legislation or of the authorities drawn upon for the *Classic* construction. Acquiescence so founded does not preclude the responsible recognition of error disclosed by subsequent study.) When, however, four years later the Court was called on to review the conviction under § 242 of a Georgia County Sheriff who had beaten a Negro prisoner to death, the opinion of four of the six Justices who believed that the statute applied merely invoked *Classic* and *stare decisis* and did not reconsider the meaning which that case had uncritically assumed was to be attached to the language, "under color" of state authority. *Screws* v. *United States*, 325 U. S. 91. The briefs in the *Screws* case did

---

[26] The Mayor and other officials of Jersey City were charged with a concerted program of discriminatory law enforcement intended to drive union organizers out of the city. The acts upon which amenability to suit under § 1979 was predicated were (1) the enforcement of a municipal ordinance which this Court held unconstitutional on its face; (2) the enforcement of a second ordinance in a manner which willfully discriminated against union organizers; and (3) "acts not under the authority of any ordinance or statute but committed under color of municipal office and as part of a deliberate municipal policy." 101 F. 2d 774, 790. The Court of Appeals for the Third Circuit held that, on these facts, all three classes of conduct, viewed together, constituted "State action." This Court affirmed and modified the decree without considering the point.

[27] That the Court had not in the *Classic* case isolated the "under color" issue from the question of "State action" is indicated by the opinions in *Snowden* v. *Hughes*, 321 U. S. 1. The latter case arose under § 1979, yet although the "State action" principle had been the basis for the decision below and was prominently treated in two opinions here, no reference was made to the "under color" phrase.

not examine critically the legislative history of the Civil Rights Acts.[28]   The only reference to this history in the plurality opinion, insofar as it bears on the interpretation of the clause "under color of . . . law," is contained in a pair of sentences discounting two statements by Senators Trumbull and Sherman regarding the Civil Rights Acts of 1866 and 1870, cited by the minority.[29]   The bulk of the plurality opinion's treatment of the issue consists of the argument that "under color" had been construed in *Classic* and that the construction there put on the words should not be abandoned or revised.   325 U. S., at 109–113.   The case of *Williams* v. *United States,* 341 U. S. 97, reaffirmed *Screws* and applied it to circumstances of third-degree brutality practiced by a private detective who held a special police officer's card and was accompanied by a regular policeman.[30]

---

[28] The brief for petitioners Screws et al. contains no citation to legislative history.   The brief for the United States, after several citations intended to demonstrate that the purpose of the Civil Rights Acts was to enforce the Fourteenth Amendment and to protect the rights which it secures (these citations, employed to the same purpose, may be found in the plurality opinion, 325 U. S., at 98–99), sets forth only one other bit of legislative material: a statement made in debate by Senator Davis of Kentucky, an opponent of the Act of 1866, to the effect that the Act would repeal the penal laws of all the States.   See Cong. Globe, 39th Cong., 1st Sess. 598.

[29] See 325 U. S., at 111 (plurality); *id.,* at 142–144 (dissent). These two statements are set forth in text at notes 38 and 39, *infra.* The plurality opinion also contains references to other aspects of the legislative history in another context, *id.,* at 98–100; see note 28, *supra.*   In his separate opinion, Mr. Justice Rutledge twice adverts to legislative materials, once with regard to matters not relevant here, *id.,* at 120, n. 13, 14, and once, pertinently, with particular reference to the position of opponents of the 1866 Act that the legislation would invade the province of the States (setting forth Senator Davis' statement, see note 28, *supra*), *id.,* at 132, n. 33.   Mr. Justice Murphy, also writing separately, does not discuss the "under color" issue.

[30] Neither the Court's opinion nor the briefs in *Williams* contain any citation to the legislative history of the Civil Rights Acts.   It is true

Thus, although this Court has three times found that conduct of state officials which is forbidden by state law may be "under color" of state law for purposes of the Civil Rights Acts, it is accurate to say that that question has never received here the consideration which its importance merits. That regard for controlling legislative history which is conventionally observed by this Court in determining the true meaning of important legislation that does not construe itself [31] has never been applied to the "under color" provisions; particularly, there has never been canvassed the full record of the debates preceding passage of the 1871 Act with which we are concerned in this case. Neither *Classic* nor *Screws* nor *Williams* warrants refusal now to take account of those debates and the illumination they afford. While we may well decline to re-examine recent cases which derive from the judicial process exercised under its adequate safeguards—documenting briefs and adequate arguments on both sides as foundation for due deliberation—the relevant demands of *stare decisis* do not preclude considering, for the first time thoroughly and in the light of the best available evidence of congressional purpose, a statutory

that between *Screws* and *Williams* Congress in 1948 re-enacted § 242 without material change. If that section were before the Court in the present case, the implications of that re-enactment might have to be appraised. Yet whatever tenuous thread of legislative approbation of *Screws* might be drawn from the kind of bulk-sale congressional action which was involved in its enactment of a whole criminal code by way of the new Title 18, U. S. C., in 1948, any attempt to tangle in that same thread § 1979—a statute which has not been touched by Congress in three quarters of a century—would exceed the bounds of fictionally implied legislative adoption.

[31] *E. g., United States* v. *United Mine Workers,* 330 U. S. 258; *United States* v. *C. I. O.,* 335 U. S. 106; *United States* v. *Harriss,* 347 U. S. 612; *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672; *Galvan* v. *Press,* 347 U. S. 522; *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448.

interpretation which started as an unexamined assumption on the basis of inapplicable citations and has the claim of a dogma solely through reiteration. Particularly is this so when that interpretation, only recently made, was at its inception a silent reversal of the judicial history of the Civil Rights Acts for three quarters of a century.

"The rule of *stare decisis,* though one tending to consistency and uniformity of decision, is not inflexible." *Hertz* v. *Woodman,* 218 U. S. 205, 212. It is true, of course, that the reason for the rule is more compelling in cases involving inferior law, law capable of change by Congress, than in constitutional cases, where this Court—although even in such cases a wise consciousness of the limitations of individual vision has impelled it always to give great weight to prior decisions—nevertheless bears the ultimate obligation for the development of the law as institutions develop. See, *e. g., Smith* v. *Allwright,* 321 U. S. 649. But the Court has not always declined to re-examine cases whose outcome Congress might have changed. See Mr. Justice Brandeis, dissenting, in *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406–407, n. 1. Decisions involving statutory construction, even decisions which Congress has persuasively declined to overrule, have been overruled here. See *Girouard* v. *United States,* 328 U. S. 61, overruling *United States* v. *Schwimmer,* 279 U. S. 644, *United States* v. *Macintosh,* 283 U. S. 605, and *United States* v. *Bland,* 283 U. S. 636; see also *Commissioner* v. *Estate of Church,* 335 U. S. 632, overruling *May* v. *Heiner,* 281 U. S. 238.

And with regard to the Civil Rights Acts there are reasons of particular urgency which authorize the Court—indeed, which make it the Court's responsibility—to reappraise in the hitherto skimpily considered context of R. S. § 1979 what was decided in *Classic, Screws* and *Williams.* This is not an area of commercial law in which, presumably, individuals may have arranged their affairs in

reliance on the expected stability of decision. Compare *National Bank* v. *Whitney,* 103 U. S. 99; *Vail* v. *Arizona,* 207 U. S. 201; *Walling* v. *Halliburton Oil Well Cementing Co.,* 331 U. S. 17; *United States* v. *South Buffalo R. Co.,* 333 U. S. 771. Nor is it merely a mine-run statutory question involving a narrow compass of individual rights and duties. The issue in the present case concerns directly a basic problem of American federalism: the relation of the Nation to the States in the critically important sphere of municipal law administration. In this aspect, it has significance approximating constitutional dimension. Necessarily, the construction of the Civil Rights Acts raises issues fundamental to our institutions. This imposes on this Court a corresponding obligation to exercise its power within the fair limits of its judicial discretion. "We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable . . . ." *Helvering* v. *Hallock,* 309 U. S. 106, 119.

Now, while invoking the prior decisions which have given "under color of [law]" a content that ignores the meaning fairly comported by the words of the text and confirmed by the legislative history, the Court undertakes a fresh examination of that legislative history. The decision in this case, therefore, does not rest on *stare decisis,* and the true construction of the statute may be thought to be as free from the restraints of that doctrine as though the matter were before us for the first time. Certainly, none of the implications which the Court seeks to draw from silences in the minority reports of congressional committees in 1956, 1957, and 1960, or from the use of "under color" language in the very different context of the Act of May 6, 1960,

74 Stat. 86—concerned, in relevant part, with the preservation of election records and with the implementation of the franchise—serves as an impressive bar to re-examination of the true scope of R. S. § 1979 itself in its pertinent legislative setting.[32]

---

[32] The Act of September 9, 1957, 71 Stat. 634, 637, provides that "No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote" at any election held solely or in part for the purpose of selecting or electing candidates for designated federal offices. Such an enactment, of course, can in no conceivable manner be considered congressional "adoption" or approbation of this Court's constructions of the "under color" clause in *Classic, Screws* and *Williams,* for the sufficient reason (among others) that the statute employs the clause only to go beyond it—manifesting a purpose, through the expression "under color of law or otherwise," to reach all individual conduct of the class described, whether or not "under color" of law, and whatever "under color" of law may mean. See H. R. Rep. No. 291, 85th Cong., 1st Sess. 12. The provisions of H. R. 627, 84th Cong., 2d Sess., as reported from the House Committee on the Judiciary and made the subject of H. R. Rep. No. 2187, 84th Cong., 2d Sess., are similar. See especially *id.*, at 9–11.

The Civil Rights Act of 1960, 74 Stat. 86, 88–89, 90, does twice use the clause "under color of [law]," but in contexts wholly different from that of R. S. § 1979. Section 301 of the 1960 Act requires every "officer of election" to retain and preserve during a specified period all records and papers which come into his possession relating to acts requisite to voting at an election wherein candidates for designated federal offices are voted for. Section 306 (which comprises the only use of "under color" language in the House bill that was the subject of H. R. Rep. No. 956, 86th Cong., 1st Sess.) defines an "officer of election" as "any person who, under color of any Federal, State, Commonwealth, or local law, statute, ordinance, regulation, authority, custom, or usage, performs or is authorized to perform any function, duty, or task in connection with any application, registration, payment of poll tax, or other act requisite to voting" in any election at which votes are cast for candidates for those designated federal offices. These provisions, like those of the 1957 Act, are of very limited scope, reaching only certain conduct affecting federal

## IV.

This case squarely presents the question whether the intrusion of a city policeman for which that policeman can show no such authority at state law as could be successfully interposed in defense to a state-law action against him, is nonetheless to be regarded as "under color" of state authority within the meaning of R. S. § 1979. Respondents, in breaking into the Monroe apartment, violated the laws of the State of Illinois.[33] Illinois law

elections. Section 601 of the 1960 Act provides that in any proceeding instituted by the Attorney General for preventive relief against the deprivation, on account of race or color, of certain voting rights, see R. S. § 2004, as amended by the Act of September 9, 1957, 71 Stat. 634, 637, 42 U. S. C. § 1971, the court shall, on proper request, make a finding whether such deprivation was or is pursuant to a pattern or practice. If the court finds such a pattern or practice, any person of that race or color resident within the affected area is entitled, during a specified period, to an order declaring him qualified to vote, "upon proof that at any election or elections (1) he is qualified under State law to vote, and (2) he has since such finding by the court been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law." Whatever meaning "under color of law" may have as so employed, Congress' use of the phrase in this narrowly limited context—applying to a situation in which voting rights have been infringed on grounds of race or color pursuant to a pattern or practice—cannot reasonably be taken as indicative of congressional attitude toward one or another possible construction of "under color" in the sweeping context of R. S. § 1979.

All this is said quite apart from the consideration of how little weight may properly be given to inferences drawn from the *silence* of *minority* reports of congressional committees, especially committees sitting almost a century after the enactment of the legislation in question.

[33] *People* v. *Grod,* 385 Ill. 584, 53 N. E. 2d 591; *People* v. *Dalpe,* 371 Ill. 607, 21 N. E. 2d 756; *People* v. *Brocamp,* 307 Ill. 448, 138 N. E. 728. See Ill. Rev. Stat., c. 38, §§ 691–699 (1959); Ill. Const., Art. II, § 6.

appears to offer a civil remedy for unlawful searches; [34] petitioners do not claim that none is available. Rather they assert that they have been deprived of due process of law and of equal protection of the laws under color of state law, although from all that appears the courts of Illinois are available to give them the fullest redress which the common law affords for the violence done them, nor does any "statute, ordinance, regulation, custom, or usage" of the State of Illinois bar that redress. Did the enactment by Congress of § 1 of the Ku Klux Act of 1871 encompass such a situation?

That section, it has been noted, was patterned on the similar criminal provision of § 2, Act of April 9, 1866. The earlier Act had as its primary object the effective nullification of the Black Codes, those statutes of the Southern legislatures which had so burdened and disqualified the Negro as to make his emancipation appear illusory. [35] The Act had been vetoed by President Johnson, whose veto message describes contemporary understanding of its second section; the section, he wrote,

> "seems to be designed to apply to some existing or future law of a State or Territory which may conflict with the provisions of the bill . . . . It provides for counteracting such forbidden legislation by imposing fine and imprisonment upon the legislators who may pass such conflicting laws, or upon the officers or agents who shall put, or attempt to put, them into execution. It means an official offense, not a com-

---

[34] See *Bucher* v. *Krause*, 200 F. 2d 576 (C. A. 7th Cir.).

[35] See Cong. Globe, 39th Cong., 1st Sess. 474, 602, 1117–1118; 1123–1124, 1151, 1159–1160, 1758–1759. See 1 Fleming, Documentary History of Reconstruction (Reprint 1950) 273–311; 2 Commager, Documents of American History (6th ed. 1958) 2–7, for typical Black Code provisions. A more dispassionate appraisal of the Codes than was possible during the turbulence of Reconstruction is found in Randall, The Civil War and Reconstruction (1937) 724–730.

226

mon crime committed against law upon the persons or property of the black race. Such an act may deprive the black man of his property, but not of the right to hold property. It means a deprivation of the right itself, either by the State judiciary or the State Legislature." [36]

And Senator Trumbull, then Chairman of the Senate Judiciary Committee,[37] in his remarks urging its passage over the veto, expressed the intendment of the second section as those who voted for it read it:

"If an offense is committed against a colored person simply because he is colored, in a State where the law affords him the same protection as if he were white, this act neither has nor was intended to have anything to do with his case, because he has adequate remedies in the State courts; but if he is discriminated against under color of State laws because he is colored, then it becomes necessary to interfere for his protection." [38]

Section 2 of the 1866 Act was re-enacted in substance in 1870 as part of "An Act to enforce the Right of Citizens . . . to vote in the several States . . . ," 16 Stat. 140,

[36] Cong. Globe, 39th Cong., 1st Sess. 1680. See also *id.*, at 1266. Light is thrown upon this distinction between the deprivation of a right and its violation—deprivation being competent to the law-making and law-enforcing organs of a State—by comparison of the language of § 1979, establishing liability for the "deprivation of any rights, privileges, or immunities secured by the Constitution . . . ," 17 Stat. 13, with the provisions of the criminal conspiracy section of the 1870 Act, penalizing conspiracies to intimidate any person in order to "hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the Constitution." 16 Stat. 140, 141. Cf. *Civil Rights Cases,* 109 U. S. 3, 17–18.

[37] Senator Trumbull had introduced the bill. Cong. Globe, 39th Cong., 1st Sess. 129.

[38] Cong. Globe, 39th Cong., 1st Sess. 1758.

144. The following colloquy on that occasion is particularly revealing:

"Mr. SHERMAN. . . . My colleague cannot deny that we can by appropriate legislation prevent any private person from shielding himself under a State regulation, and thus denying to a person the right to vote . . . .

"Mr. CASSERLY. I should like to ask the Senator from Ohio how a State can be said to abridge the right of a colored man to vote when some irresponsible person in the streets is the actor in that wrong?

"Mr. SHERMAN. If the offender, who may be a loafer, the meanest man in the streets, covers himself under the protection or color of a law or regulation or constitution of a State, he may be punished for doing it.

"Mr. CASSERLY. Suppose the State law authorizes the colored man to vote; what then?

"Mr. SHERMAN. That is not the case with which we are dealing. . . . This bill only proposes to deal with offenses committed by officers or persons under color of existing State law, under color of existing State constitutions. No man could be convicted under this bill reported by the Judiciary Committee unless the denial of the right to vote was done under color or pretense of State regulation. The whole bill shows that. . . . [T]he first and second sections of the bill . . . simply punish officers as well as persons for discrimination under color of State laws or constitutions; and it so provides all the way through." [39]

---

[39] Cong. Globe, 41st Cong., 2d Sess. 3663. Mr. Sherman's remarks were addressed not specifically to the section which paralleled the 1866 "under color" language, but to the whole of the pending Senate amendment, a substitute for the House bill. Compare *id.*, at 3561

228

The original text of the present § 1979 contained words, left out in the Revised Statutes, which clarified the objective to which the provision was addressed:

> "That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,* be liable to the party injured . . . ." [40]

Representative Shellabarger, reporting the section, explained it to the House as "in its terms carefully confined to giving a civil action for such wrongs against citizenship as are done under color of State laws which abridge these rights." [41]  Senator Edmunds, steering the measure through the Senate, found constitutional sanction for it in the Fourteenth Amendment, explaining that state action may consist in executive nonfeasance as well as malfeasance, so that any offenses against a citizen in a

---

with *id.,* at 3503.  It was from the Senate amendment, containing an "under color" provision modeled on § 2 of the Act of 1866, that the 1870 Act, as finally enacted, immediately derived.

[40] 17 Stat. 13.  (Emphasis added.)

[41] Cong. Globe, 42d Cong., 1st Sess., App. 68.  Mr. Shellabarger was the Chairman of the House Select Committee which drafted the Ku Klux Act.  In reporting it out of committee, he described its first section, now § 1979, as modeled on the second section of the First Civil Rights Act of 1866.  *Ibid.*  In debate on the 1866 Act Shellabarger had said that the earlier provision was meant "not to usurp the powers of the States to punish offenses generally against the rights of citizens in the several States, but its whole force is expended in defeating an attempt, under State laws, to deprive races and the members thereof as such of the rights enumerated in this act." Cong. Globe, 39th Cong., 1st Sess. 1294.

State are susceptible of federal protection "unless the criminal who shall commit those offenses is punished and the person who suffers receives that redress which the principles and spirit of the laws entitle him to have." [42] And James A. Garfield supported the bill in the House as "so guarded as to preserve intact the autonomy of the States, the machinery of the State governments, and the municipal organizations established under State laws." [43]

Indeed, the Ku Klux Act as a whole encountered in the course of its passage strenuous constitutional objections which focused precisely upon an assertedly unauthorized extension of federal judicial power into areas of exclusive state competence.[44]  A special target was § 2 of the bill as reported to the House, providing criminal penalties:

> "if two or more persons shall, within the limits of any State, band, conspire, or combine together to do

---

[42] Cong. Globe, 42d Cong., 1st Sess. 697.

[43] *Id.*, at 808.

[44] The claim was several times repeated in debate that the bill operated to absorb "the entire jurisdiction of the States over their local and domestic affairs," *id.*, at 366, or that it would bring "private grievances to the Federal courts." *Id.*, at 395. With very few exceptions (*ibid., id.*, at 361, 429, App. 91) these criticisms were not directed to the Act's first section, now § 1979. See also *id.*, at 416, 510, 660, App. 160, 179, 241–243, 258. One opposition speaker did object specifically to § 1 as providing a federal forum for the deprivation of a suitor's rights although "The offenses committed against him may be the common violations of the municipal law of his State." *Id.*, at App. 50. And one supporter of the measure, who argued that the Fourteenth Amendment gave Congress power to enact a general criminal law, if necessary, for the protection of citizens under the Privileges and Immunities, Due Process, and Equal Protection Clauses, said of § 2 of the Act of 1866, the model for § 1 of the 1871 Act, that it punished acts which would otherwise be "mere misdemeanors" at state law. *Id.*, at 504. But these two remarks are the only assertions, throughout hundreds of pages of debate, that § 1 might reach conduct which state law proscribed. Proponents of the bill, addressing themselves to the charge of federal over-

any act in violation of the rights, privileges, or immunities of any person, to which he is entitled under the Constitution and laws of the United States, which, committed within a place under the sole and exclusive jurisdiction of the United States, would, under any law of the United States then in force, constitute the crime of either murder, manslaughter, mayhem, robbery, assault and battery, perjury, subornation of perjury, criminal obstruction of legal, process [*sic*] or resistance of officers in discharge of official duty, arson, or larceny . . . ."[45]

In vain the proponents of this section argued its propriety, seeking to support it by argument *ex necessitate* from the complete failure of state judicial and executive organs to control the depredations of the Klan.[46] Even

reaching, insisted that they could support the measure only because they understood that it did not presume to enter upon that realm of protection of rights traditionally reserved to the States. *Id.*, at 800. See notes 47–50, *infra*. And see the statement of Senator Edmunds, *id.*, at 697–698: "[The bill] does not undertake to interpose itself out of the regular order of the administration of law. It does not attempt to deprive any State of the honor which is due to the punishment of crime."

[45] *Id.*, at 317. Any act to effect the object of the conspiracy rendered all the conspirators guilty of a felony.

[46] The impetus for the enactment of the Ku Klux Act was President Grant's message to Congress asserting that a condition then existed in some States which rendered life and property insecure and which was beyond the power of state authorities to control. See *id.*, at App. 226. Throughout the debates on the bill the note was repeated: there was a need for federal action to supplant state administration which was failing to provide effective protection for private rights. *Id.*, at 345, 368, 374, 428, 444, 457–459, 460, 476, 505–506, 653, App. 78, 167, 185, 248–249, 252. Constitutional authority for such federal action was sought in the logic that "States" were ordered by the Fourteenth Amendment not to "deny" equal protection of the laws; that a "State" in effect denied such protection not only when its legislation was on its face unequal, but whenever its judicial or execu-

in the Reconstruction Congress, the majority party split.
Many balked at legislation which they regarded as estab-
lishing a general federal jurisdiction for the protection of
person and property in the States.[47]   Only after a com-

tive authorities by a consistent course of practice, "permanently
and as a rule" refused to enforce its laws for the protection of some
class of persons.  *Id.*, at 334.  See *id.*, at 416, 482, 505–506, 606–608,
697, App. 251–252, 315.  But what was deemed the prerequisite to
validity of congressional action in implementation of the Amend-
ment under this theory was no less than a State's permitting "the
rights of citizens to be systematically trampled upon without color of
law," *id.*, at 375; "A systematic failure to make arrests, to put on
trial, to convict, or to punish offenders."  *Id.*, at 459.  The National
Government was thought powerless to intervene to regulate "A mere
assault and battery, or arson, or murder . . . .  The law is believed
to be sufficient to cover such cases, and the officers of justice amply
able to arrest and punish the offenders."  *Id.*, at 457.  See also
Mr. Perry's assertion, *id.*, at App. 79, that the wrongs which Con-
gress may remedy "are not injuries inflicted by mere individuals
or upon ordinary rights of individuals," but injuries inflicted "under
color of State authority or by conspiracies and unlawful combina-
tions with at least the tacit acquiescence of the State authorities."
Wrongs susceptible of adequate redress before the state courts evi-
dently did not concern Congress, and Congress in 1871 did not attempt
to reach those wrongs.

[47] General Garfield, *id.*, at App. 154: "In so far as this section
punishes persons who under color of any State law shall deny or refuse
to others the equal protection of the laws, I give it my cheerful
support; but when we provide by congressional enactment to punish
a mere violation of a State law, we pass the line of constitutional
authority."  (This objection is taken specifically to § 3 of the Act,
authorizing federal executive intervention under certain circum-
stances.)  See also, *e. g.*, *id.*, at App. 113–116: Mr. Farnsworth,
who had no objection to § 1, now § 1979, vigorously opposed § 2 as
extending to encompass individual action.  Farnsworth regarded the
Fourteenth Amendment as directed exclusively to the discrimina-
tions of state *legislation*, and his approval of § 1 indicates his under-
standing that it referred to conduct authorized by such legislation.
Garfield seems to have agreed that § 1 did not reach even systematic
maladministration of state law fair on its face.  See *id.*, at App. 153.

232

plete rewriting of the section to meet these constitutional objections could the bill be passed.[48] Yet almost none of those who had decried § 2 as undertaking impermissibly to make the national courts tribunals of concurrent jurisdiction for the punishment of state-law offenses expressed similar objections to § 1, later § 1979.[49] One of the most

[48] Mr. Shellabarger proposed the amendment to § 2, *id.*, at 477, to meet the constitutional objections which the original form of that section had evoked. See *id.*, at 478, App. 187–190, 313. Numerous members of the majority party thereupon withdrew their opposition to the bill. See *id.*, at 514, App. 187–190, 231, 313–315. The form of the second section as it was finally enacted is, in relevant part, substantially that of R. S. § 1980, 42 U. S. C. § 1985: "If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State . . . from giving or securing to all persons within such State . . . the equal protection of the laws; [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." See 17 Stat. 13. Mr. Shellabarger emphasized that the purpose of the change was to make the gist of the offense a deprivation of *equality* of rights, not a deprivation of rights alone. Cong. Globe, 42d Cong., 1st Sess. 478.

[49] Representative Poland had argued the unconstitutionality of the original § 2 on the ground that it sought to extend federal *protection* to private persons and property, whereas the Fourteenth Amendment guaranteed only *equal* protection, leaving the States free to protect or not to protect whatever interests they chose so long as the protection afforded was non-discriminatory. The amendment of § 2 met this objection, and Mr. Poland supported the bill, finding no cause for concern in the language of § 1. *Id.*, at 514. For other congressmen who opposed the initial form of § 2 but found no constitutional impediment to enactment of § 1, see *id.*, at 578–579 (Trumbull), App. 86 (Storm), 150–154 (Garfield), 187–190 (Willard). Farnsworth objected to even the amended form of § 2, but voiced no adverse

vehement of those who could find no constitutional sanction for federal judicial control of conduct already proscribed by state law, and who therefore opposed original § 2 as reaching beyond the limits of congressional competence, expressly supported § 1 as affording "further redress for violations under State authority of constitutional rights." [50]

The general understanding of the legislators unquestionably was that, as amended, the Ku Klux Act did "not undertake to furnish redress for wrongs done by one person upon another in any of the States . . . in violation of their laws, unless he also violated some law of the United States, nor to punish one person for an ordinary assault and battery . . . ." [51] Even those who—opposing the constitutional objectors—found sufficient congressional power in the Enforcement Clause of the Fourteenth Amendment to give this kind of redress, deemed inexpedient the exercise of any such power: "Convenience and courtesy to the States suggest a sparing use, and never so far as to supplant the State authorities except in cases of extreme necessity, and when the State governments criminally refuse or neglect those duties which are imposed

criticism of § 1. *Id.*, at 513. Slater, also opposing § 2, argued that if Congress could assert general criminal jurisdiction in the States (as he contended that section did), it *could* also assert general civil jurisdiction in protection of persons and property. Apparently he did not regard § 1 as threatening such an assertion. *Id.*, at App. 304.

There was in fact relatively little opposition to § 1. See *id.*, at 568. Many vociferous opponents of the Act did not assail that section. *E. g., id.*, at 419, App. 112, 134–139, 300–303. What objections there were did not suggest that the section usurped state power by assuming a concurrent authority to redress state-law violations, but, quite the opposite, attacked the section for penalizing state judges, legislators and administrative officials acting in full obedience to state law, "under a solemn, official oath, though as pure in duty as a saint." *Id.*, at 365.

[50] *Id.*, at App. 315. See *id.*, at App. 313–315.

[51] *Id.*, at 579.

234

upon them." [52]   Extreme Radicals, those who believed that the remedy for the oppressed Unionists in the South was a general expansion of federal judicial jurisdiction so that "loyal men could have the privilege of having their causes, civil and criminal, tried in the Federal courts," were disappointed with the Act as passed.[53]

Finally, it is significant that the opponents of the Act, exhausting ingenuity to discover constitutional objections to every provision of it, also construed § 1 as addressed only to conduct authorized by state law, and therefore within the admitted permissible reach of Fourteenth Amendment federal power.   "The first section of this bill prohibits any invidious legislation by States against the rights or privileges of citizens of the United States," one such opponent paraphrased the provision.[54]   And Senator Thurman, who insisted vociferously on the absence of federal power to penalize a conspiracy of individuals to violate state law ("that is a case of mere individual violence, having no color whatsoever of authority of law, either Federal or State; and to say that you can punish men for that mere conspiracy, which is their individual act, and which is a crime against the State laws themselves, punishable by the State laws, is simply to wipe out all the State jurisdiction over crimes and transfer it bodily to the Congress"),[55] admitted without question the constitutionality of § 1 [56] ("It refers to a deprivation under color of law, either statute law or 'custom or usage' which has become common law").[57]

---

[52] *Id.*, at 368 (Sheldon).  See also *id.*, at 501 (Frelinghuysen).

[53] *Id.*, at App. 277 (Porter).

[54] *Id.*, at App. 268 (Sloss).

[55] *Id.*, at App. 218.

[56] *Id.*, at App. 216.

[57] *Id.*, at App. 217.  One significant objection made to § 1 reveals its opponents' comprehension of its scope.  It was objected that the section was unnecessary inasmuch as under Amendment Fourteen and the Supremacy Clause there was no longer any danger of "violation

The Court now says, however, that "It was not the unavailability of state remedies but the failure of certain States to enforce the laws with an equal hand that furnished the powerful momentum behind this 'force bill.' " Of course, if the notion of "unavailability" of remedy is limited to mean an absence of statutory, paper right, this is in large part true.[58]   Insofar as the Court undertakes to demonstrate—as the bulk of its opinion seems to do— that § 1979 was meant to reach some instances of action not specifically authorized by the avowed, apparent, written law inscribed in the statute books of the States, the argument knocks at an open door.   No one would or could deny this, for by its express terms the statute comprehends deprivations of federal rights under color of any "statute, ordinance, regulation, *custom, or usage*" of a State.   (Emphasis added.)   The question is, *what* class of cases other than those involving state statute law were meant to be reached.   And, with respect to this question, the Court's conclusion is undermined by the very portions of the legislative debates which it cites.   For surely the misconduct of individual municipal police officers, subject to the effective oversight of appropriate state administrative and judicial authorities, presents a situation which differs *toto coelo* from one in which "Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress," [59] or in which murder rages while a State makes

---

of the rights of citizens under color of the *laws* of the States." *Id.*, at App. 231 (Blair).   The appellate jurisdiction of the Supreme Court of the United States under § 25 of the Judiciary Act of 1789, providing for review on writ of error of state court judgments sustaining state authority against federal constitutional challenge or striking down asserted federal authority, was regarded as offering sufficient protection against the deprivations of rights covered by § 1. *Id.*, at App. 86 (Storm).

[58] See note 46, *supra*.

[59] Cong. Globe, 42d Cong., 1st Sess. 374.

"no successful effort to bring the guilty to punishment or afford protection or redress," [60] or in which the "State courts . . . [are] unable to enforce the criminal laws . . . or to suppress the disorders existing," [61] or in which, in a State's "judicial tribunals one class is unable to secure that enforcement of their rights and punishment for their infraction which is accorded to another," [62] or "of . . . hundreds of outrages . . . not one [is] punished," [63] or "the courts of the . . . States fail and refuse to do their duty in the punishment of offenders against the law," [64] or in which a "class of officers charged under the laws with their administration permanently and as a rule refuse to extend [their] protection." [65]   These statements indicate that Congress—made keenly aware by the post-bellum conditions in the South that States through their authorities could sanction offenses against the individual by settled practice which established state law as truly as written codes—designed § 1979 to reach, as well, official conduct which, because engaged in "permanently and as a rule," or "systematically," [66] came through acceptance by law-administering officers to constitute "custom, or usage" having the cast of law.   See *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362, 369.   They do not indicate an attempt to reach, nor does the statute by its terms include, instances of acts in defiance of state law and which no settled state practice, no systematic pattern of official action or inaction, no "custom, or usage, of any State," insulates from effective and adequate reparation by the State's authorities.

[60] *Id.,* at 428.
[61] *Id.,* at 653.
[62] *Id.,* at App. 315.
[63] *Id.,* at 505.
[64] *Id.,* at App. 179.
[65] *Id.,* at 334.
[66] See note 46, *supra.*

Rather, all the evidence converges to the conclusion that Congress by § 1979 created a civil liability enforceable in the federal courts only in instances of injury for which redress was barred in the state courts because some "statute, ordinance, regulation, custom, or usage" sanctioned the grievance complained of. This purpose, manifested even by the so-called "Radical" Reconstruction Congress in 1871, accords with the presuppositions of our federal system. The jurisdiction which Article III of the Constitution conferred on the national judiciary reflected the assumption that the state courts, not the federal courts, would remain the primary guardians of that fundamental security of person and property which the long evolution of the common law had secured to one individual as against other individuals. The Fourteenth Amendment did not alter this basic aspect of our federalism.[67]

Its commands were addressed to the States. Only when the States, through their responsible organs for the formulation and administration of local policy, sought to deny or impede access by the individual to the central government in connection with those enumerated functions assigned to it, or to deprive the individual of a certain minimal fairness in the exercise of the coercive forces of the State, or without reasonable justification to treat him differently than other persons subject to their jurisdiction, was an overriding federal sanction imposed. As between individuals, no corpus of substantive rights was guaranteed by the Fourteenth Amendment, but only "due process of law" in the ascertainment and enforcement of rights and equality in the enjoyment of rights and safeguards that the States afford. This was the base of the distinction between federal citizenship and state

[67] "The Fourteenth Amendment, itself a historical product, did not destroy history for the States . . . ." *Jackman* v. *Rosenbaum Co.,* 260 U. S. 22, 31.

238

citizenship drawn by the *Slaughter-House Cases,* 16 Wall. 36. This conception begot the "State action" principle on which, from the time of the *Civil Rights Cases,* 109 U. S. 3, this Court has relied in its application of Fourteenth Amendment. guarantees. As between individuals, that body of mutual rights and duties which constitute the civil personality of a man remains essentially the creature of the legal institutions of the States.

But, of course, in the present case petitioners argue that the wrongs done them were committed not by individuals but by the police as state officials. There are two senses in which this might be true. It might be true if petitioners alleged that the redress which state courts offer them against the respondents is different than that which those courts would offer against other individuals, guilty of the same conduct, who were not the police. This is not alleged. It might also be true merely because the respondents *are* the police—because they are clothed with an appearance of official authority which is in itself a factor of significance in dealings between individuals. Certainly the night-time intrusion of the man with a star and a police revolver is a different phenomenon than the night-time intrusion of a burglar. The aura of power which a show of authority carries with it has been created by state government. For this reason the national legislature, exercising its power to implement the Fourteenth Amendment, might well attribute responsibility for the intrusion to the State and legislate to protect against such intrusion. The pretense of authority alone might seem to Congress sufficient basis for creating an exception to the ordinary rule that it is to the state tribunals that individuals within a State must look for redress against other individuals within that State. The same pretense of authority might suffice to sustain congressional legislation creating the exception. See *Ex parte Virginia,* 100 U. S. 339. But until Congress has

declared its purpose to shift the ordinary distribution of judicial power for the determination of causes between co-citizens of a State, this Court should not make the shift. Congress has not in § 1979 manifested that intention.

The unwisdom of extending federal criminal jurisdiction into areas of conduct conventionally punished by state penal law is perhaps more obvious than that of extending federal civil jurisdiction into the traditional realm of state tort law. But the latter, too, presents its problems of policy appropriately left to Congress. Suppose that a state legislature or the highest court of a State should determine that within its territorial limits no damages should be recovered in tort for pain and suffering, or for mental anguish, or that no punitive damages should be recoverable. Since the federal courts went out of the business of making "general law," *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, such decisions of local policy have admittedly been the exclusive province of state lawmakers. Should the civil liability for police conduct which can claim no authority under local law, which is actionable as common-law assault or trespass in the local courts, comport different rules? Should an unlawful intrusion by a policeman in Chicago entail different consequences than an unlawful intrusion by a hoodlum? These are matters of policy in its strictly legislative sense, not for determination by this Court. And if it be, as it is, a matter for congressional choice, the legislative evidence is overwhelming that § 1979 is not expressive of that choice. Indeed, its precise limitation to acts "under color" of state statute, ordinance or other authority appears on its face designed to leave all questions of the nature and extent of liability of individuals to the laws of the several States except when a State seeks to shield those individuals under the special barrier of state authority. To extend Civil Rights Act liability beyond that point is

to interfere in areas of state policymaking where Congress has not determined to interfere.

Nor will such interference be negligible. One argument urged in *Screws* in favor of the result which that case reached was the announced policy of self-restraint of the Department of Justice in the prosecution of cases under 18 U. S. C. § 242. See 325 U. S., at 159–160. Experience indicates that private litigants cannot be expected to show the same consideration for the autonomy of local administration which the Department purportedly shows.[68]

Relevant also are the effects upon the institution of federal constitutional adjudication of sustaining under § 1979 damage actions for relief against conduct allegedly violative of federal constitutional rights, but plainly

---

[68] In the last twenty years the lower federal courts have encountered a volume of litigation seeking Civil Rights Act redress for a variety of wrongs ranging from arbitrary refusal by housing department officials to issue architect's certificates, *Burt* v. *New York,* 156 F. 2d 791 (C. A. 2d Cir.), to allegedly malicious charges made by a state grand jury. *Lyons* v. *Baker,* 180 F. 2d 893 (C. A. 5th Cir.). Plaintiffs have sought redress against the signers of a mandamus petition, parties to a state mandamus proceeding to compel city commissioners to hold a local referendum, *Lyons* v. *Dehon,* 188 F. 2d 534 (C. A. 5th Cir.), against state officials administering a local WPA project for refusing to employ the plaintiff and instituting insanity proceedings against him, *Love* v. *Chandler,* 124 F. 2d 785 (C. A. 8th Cir.), against adversaries and judge in a state civil judicial proceeding where egregious error resulting in holding against plaintiffs was alleged, *Bottone* v. *Lindsley,* 170 F. 2d 705 (C. A. 10th Cir.) ; *Campo* v. *Niemeyer,* 182 F. 2d 115 (C. A. 7th Cir.) ; cf. *Moffett* v. *Commerce Trust Co.,* 187 F. 2d 242 (C. A. 8th Cir.). Most courts have refused to convert what would otherwise be ordinary state-law claims for false imprisonment or malicious prosecution or assault and battery into civil rights cases on the basis of conclusory allegations of constitutional violation. *Lyons* v. *Weltmer,* 174 F. 2d 473 (C. A. 4th Cir.) ; *McGuire* v. *Todd,* 198 F. 2d 60 (C. A. 5th Cir.) ; *Curry* v. *Ragan,* 257 F. 2d 449 (C. A. 5th Cir.) ; *Deloach* v. *Rogers,* 268 F. 2d 928 (C. A. 5th Cir.) ; *Agnew* v. *City of Compton,* 239 F. 2d 226 (C. A. 9th Cir.).

violative of state law. Permitting such actions necessitates the immediate decision of federal constitutional issues despite the admitted availability of state-law remedies which would avoid those issues.[69] This would make inroads, throughout a large area, upon the principle of federal judicial self-limitation which has become a significant instrument in the efficient functioning of the national judiciary. See *Railroad Comm'n of Texas* v. *Pullman Co.,* 312 U. S. 496, and cases following. Self-limitation is not a matter of technical nicety, nor judicial timidity. It reflects the recognition that to no small degree the effectiveness of the legal order depends upon the infrequency with which it solves its problems by resorting to determinations of ultimate power. Especially is this true where the circumstances under which those ultimate determinations must be made are not conducive to the most mature deliberation and decision. If § 1979 is made a vehicle of constitutional litigation in cases where state officers have acted lawlessly at state law, difficult questions of the federal constitutionality of certain official practices—lawful perhaps in some States, unlawful in others—may be litigated between private parties without the participation of responsible state authorities which is obviously desirable to protect legitimate state interests, but also to better guide adjudication by competent record-making and argument.

Of course, these last considerations would be irrelevant to our duty if Congress had demonstrably meant to reach by § 1979 activities like those of respondents in this case. But where it appears that Congress plainly did not have that understanding, respect for principles which this Court has long regarded as critical to the most effective func-

[69] See, *e. g., Valle* v. *Stengel,* 176 F. 2d 697 (C. A. 3d Cir.), a case which decides a number of novel and difficult questions of federal constitutional law. The alleged conduct of defendant sheriff which was held actionable under § 1979 was in violation of state law.

tioning of our federalism should avoid extension of a statute beyond its manifest area of operation into applications which invite conflict with the administration of local policies. Such an extension makes the extreme limits of federal constitutional power a law to regulate the quotidian business of every traffic policeman, every registrar of elections, every city inspector or investigator, every clerk in every municipal licensing bureau in this country. The text of the statute, reinforced by its history, precludes such a reading.

In concluding that police intrusion in violation of state law is not a wrong remediable under R. S. § 1979, the pressures which urge an opposite result are duly felt. The difficulties which confront private citizens who seek to vindicate in traditional common-law actions their state-created rights against lawless invasion of their privacy by local policemen are obvious,[70] and obvious is the need for more effective modes of redress. The answer to these urgings must be regard for our federal system which presupposes a wide range of regional autonomy in the kinds of protection local residents receive. If various common-law concepts make it possible for a policeman—but no more possible for a policeman than for any individual hoodlum intruder—to escape without liability when he has vandalized a home, that is an evil. But, surely, its remedy devolves, in the first instance, on the States. Of course, if the States afford less protection against the police, as police, than against the hoodlum—if under authority of state "statute, ordinance, regulation, custom, or usage" the police are specially shielded—

---

[70] See Foote, Tort Remedies for Police Violations of Individual Rights, 39 Minn. L. Rev. 493 (1955); Barrett, Exclusion of Evidence Obtained by Illegal Searches—A Comment on People vs. Cahan, 43 Cal. L. Rev. 565 (1955); cf. Edwards, Criminal Liability for Unreasonable Searches and Seizures, 41 Va. L. Rev. 621 (1955). And see, e. g., State for Use Brooks v. Wynn, 213 Miss. 306, 56 So. 2d 824.

§ 1979 provides a remedy which dismissal of petitioners' complaint in the present case does not impair. Otherwise, the protection of the people from local delinquencies and shortcomings depends, as in general it must, upon the active consciences of state executives, legislators and judges.[71] Federal intervention, which must at best be limited to securing those minimal guarantees afforded by the evolving concepts of due process and equal protection, may in the long run do the individual a disservice by deflecting responsibility from the state lawmakers, who hold the power of providing a far more comprehensive scope of protection. Local society, also, may well be the loser, by relaxing its sense of responsibility and, indeed, perhaps resenting what may appear to it to be outside interference where local authority is ample and more appropriate to supply needed remedies.

This is not to say that there may not exist today, as in 1871, needs which call for congressional legislation to protect the civil rights of individuals in the States. Strong contemporary assertions of these needs have been expressed. Report of the President's Committee on Civil Rights, To Secure These Rights (1947); Chafee, Safeguarding Fundamental Human Rights: The Tasks of States and Nation, 27 Geo. Wash. L. Rev. 519 (1959). But both the insistence of the needs and the delicacy of the issues involved in finding appropriate means for their satisfaction demonstrate that their

---

[71] The common law seems still to retain sufficient flexibility to fashion adequate remedies for lawless intrusions. Compare with the cases cited in *Wolf* v. *Colorado,* 338 U. S. 25, 30, n. 1; *Bull* v. *Armstrong,* 254 Ala. 390, 48 So. 2d 467 (1950); *Sarafini* v. *San Francisco,* 143 Cal. App. 2d 570, 300 P. 2d 44 (1956); *Ware* v. *Dunn,* 80 Cal. App. 2d 936, 183 P. 2d 128 (1947); *Walker* v. *Whittle,* 83 Ga. App. 445, 64 S. E. 2d 87 (1951); *Johnson* v. *Atlantic Coast Line R. Co.,* 142 S. C. 125, 140 S. E. 443 (1927); *Deaderick* v. *Smith,* 33 Tenn. App. 151, 230 S. W. 2d 406 (1950).

demand is for legislative, not judicial, response. We cannot expect to create an effective means of protection for human liberties by torturing an 1871 statute to meet the problems of 1960.

Of an enactment like the Civil Rights Act, dealing with the safeguarding and promotion of individual freedom, it is especially relevant to be mindful that, since it is projected into the future, it is ambulatory in its scope, the statute properly absorbing the expanding reach of its purpose to the extent that the words with which that purpose is conveyed fairly bear such expansion. But this admissible expansion of meaning through the judicial process does not entirely unbind the courts and license their exercise of what is qualitatively a different thing, namely, the formulation of policy through legislation. In one of the last writings by that tough-minded libertarian, who was also no friend of narrow construction, Professor Zechariah Chafee, Jr., he admonished against putting the Civil Rights Act to dubious new uses even though, as a matter of policy, they might be desirable in the changed climate nearly a hundred years after its enactment: "At all events, we can be sure of one thing. If federal protection be desirable, we ought to get it by something better than a criminal statute of antiquated uncertainties and based on the out-moded Privileges and Immunities Clause of the Fourteenth Amendment. . . . It is very queer to try to protect human rights in the middle of the Twentieth Century by a left-over from the days of General Grant." *Id.,* at 529. It is not a work for courts to melt and recast this statute. "Under color" of law meant by authority of law in the nineteenth century. No judicial sympathy, however strong, for needs now felt can give the phrase—a phrase which occurs in a statute, not in a constitution—any different meaning in the twentieth. Compare Mr. Justice Holmes' varying approaches to construction of the same word in a statute

and in the Constitution, *Towne* v. *Eisner,* 245 U. S. 418, and *Eisner* v. *Macomber,* 252 U. S. 189, 219 (dissenting).

This meaning, no doubt, poses difficulties for the case-by-case application of § 1979. Manifestly the applicability of the section in an action for damages cannot be made to turn upon the actual availability or unavailability of a state-law remedy for each individual plaintiff's situation. Prosecution to adverse judgment of a state-court damage claim cannot be made prerequisite to § 1979 relief. In the first place, such a requirement would effectively nullify § 1979 as a vehicle for recovering damages.[72] In the second place, the conclusion that police activity which violates state law is not "under color" of state law does not turn upon the existence of a state tort remedy. Rather, it recognizes the freedom of the States to fashion their own laws of torts in their own way under no threat of federal intervention save where state law makes determinative of a plaintiff's rights the particular circumstance that defendants are acting by state authority. Section 1979 was not designed to cure and level all the possible imperfections of local common-law doctrines, but to provide for the case of the defendant who can claim that some particular dispensation of state authority immunizes him from the ordinary processes of the law.

---

[72] This is so not only because of the practical impediment to Civil Rights Act relief which would be posed by a two-suit requirement, but because the efficient process of judicial administration might well require that a plaintiff present his federal constitutional contention to the state courts along with his state-law contentions, that he there assert the federal unconstitutionality of maintaining the defense of state authorization to a state-law tort action. Cf. *Angel* v. *Bullington,* 330 U. S. 183. Of course, once that federal contention is properly presented to the state courts, plaintiff has open for review here an adverse state-court judgment; but if plaintiff were successful in this Court, the effect of our disposition would be to return plaintiff to the state courts for a state-law measure of relief.

It follows that federal courts in actions at law under § 1979 would have to determine whether defendants' conduct is in violation of, or under color of, state law often with little guidance from earlier state decisions. Such a determination will sometimes be difficult, of course. But Federal District Courts sitting in diversity cases are often called upon to determine as intricate and uncertain questions of local law as whether official authority would cloak a given practice of the police from liability in a state-court suit. Certain fixed points of reference will be available. If a plaintiff can show that defendant is acting pursuant to the specific terms of a state statute or of a municipal ordinance, § 1979 will apply. See *Lane* v. *Wilson,* 307 U. S. 268. If he can show that defendant's conduct is within the range of executive discretion in the enforcement of a state statute, or municipal ordinance, § 1979 will apply. See *Hague* v. *C. I. O.,* 307 U. S. 496. Beyond these cases will lie the admittedly more difficult ones in which he seeks to show some " 'custom or usage' which has become common law." [73]

[73] See note 57, *supra.* Cf. *Civil Rights Cases,* 109 U. S. 3, 16. And see *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362, 369: "Here . . . all the organs of the state are conforming to a practice, systematic, unbroken for more than forty years, and now questioned for the first time. It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law. . . . Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text."

Where the jurisdiction of a Federal District Court is invoked to vindicate a claim under § 1979 and where that court finds that defendants' conduct is not under color of state law, difficult questions may also arise as to whether the court should nevertheless determine the respective rights of the parties at state law, under the doctrine of *Hurn* v. *Oursler,* 289 U. S. 238, and *Bell* v. *Hood,* 327 U. S. 678. But

## V.

My Brother HARLAN's concurring opinion deserves separate consideration. It begins by asking what is its essential question: Why would the Forty-second Congress, which clearly provided tort relief in the federal courts for violations of constitutional rights by acts of a policeman acting pursuant to state authority, not also have provided the same relief for violations of constitutional rights by a policeman acting in violation of state authority? What, it inquires, would cause a Congress to distinguish between the two situations? Examining a first possible differentiating factor—the differing degrees of adequacy of protection of person and property already available in the state courts—it reasons that this could not have been significant in view of Congress' purpose in 1871, for that purpose was not to enact a statute having "merely a jurisdictional function, shifting the load of federal supervision from the Supreme Court to the lower courts and providing a federal tribunal for fact findings."

see *California Water Service Co.* v. *City of Redding*, 304 U. S. 252; *Massachusetts Universalist Convention* v. *Hildreth & Rogers Co.*, 183 F. 2d 497 (C. A. 1st Cir.) ; *Robinson* v. *Stanley Home Prods. Inc.*, 272 F. 2d 601 (C. A. 1st Cir.). Petitioners in this case have never throughout the litigation below raised the issue of the possible application of the *Hurn* rule to these circumstances, nor is that issue among the questions presented in their petition for certiorari here. Under our Rule 23, subpar. 1 (c) it is not now, therefore, before the Court, and there is no intention here to intimate any opinion on the novel problem of federal jurisdiction of state-law claims "pendent" to such a case as this. Suffice it to say that whatever application *Hurn* may have to these situations, its application will entail a very different level of federal judicial involvement with the adjudication of rights between individuals in a State than would the interpretation of § 1979 which petitioners urge. Whatever incursion into areas of conventionally exclusive state-court competence jurisdiction "pendent" to a § 1979 claim might entail would touch considerations not peculiar to § 1979, but rather which concern the *Hurn* doctrine.

Examining the other possible distinction—the difference between injuries to individuals from isolated acts of abuse of authority by state officers and injuries to individuals from acts sanctioned by the dignity of state law—it finds that this, too, could not have been important, especially to a Congress which was aware of the existence of state constitutional guarantees of protection to the individual, and which enacted the conspiracy statute which became R. S. § 1980 and is now 42 U. S. C. § 1985.

To ask why a Congress which legislated to reach a state officer enforcing an unconstitutional law or sanctioned usage did not also legislate to reach the same officer acting unconstitutionally without authority is to abstract this statute from its historical context. The legislative process of the post-bellum Congresses which enacted the several Civil Rights Acts was one of struggle and compromise in which the power of the National Government was expanded piece by piece against bitter resistance; the Radicals of 1871 had to yield ground and bargain over detail in order to keep the moderate Republicans in line.[74] This was not an endeavor for achieving legislative patterns of analytically satisfying symmetry. It was a contest of large sallies and small retreats in which as much ground was occupied, at any time, as the temporary coalescences of forces strong enough to enroll a prevailing vote could agree upon. To assume that if Congress reached one situation it would also have reached another situation involving not dissimilar problems—assuming, *arguendo*, that the problems, viewed in intellectual abstraction, are not dissimilar—ignores the temper of the times which produced the Ku Klux Act. This approach would be persuasive only if the two situations, that of a

---

[74] See the history of § 2 of the Ku Klux Act described, *supra*, at notes 44–50. For an excellent picture of the background of this legislative struggle, see McKitrick, Andrew Johnson and Reconstruction (1960).

state officer acting pursuant to state authority and that of a state officer acting without state authority, were so entirely similar that they would not, in 1871, have been perceived as two different situations at all. In view of the fierce debate which occupied the Forty-second Congress as to whether the Fourteenth Amendment had been intended to do more than invalidate state legislation offensive on its face,[75] this supposition must be ruled out. Contrariwise, it is historically persuasive that the Forty-second Congress, which was not thinking in neat abstract categories, designed a statute to protect federal constitutional rights from an immediate evil perceived to be grave—the evil described by the statute's sponsor, Mr. Shellabarger, "such wrongs . . . as are done under color of State laws which abridge these rights," [76]—but did not, by the same measure, seek to control unconstitutional action abusive of a state authority which did not, itself, "abridge these rights."

Moreover, even under the most rigorous analysis the two situations argumentatively deemed not dissimilar are indeed dissimilar, and dissimilar in both of the two relevant aspects. As to the adequacy of state-court protection of person and property, there seems a very sound distinction, as a class, between injuries sanctioned by state law (as to which there can never be state-court redress, if at all, unless (1) the state courts are sufficiently receptive to a federal claim to declare their own law unconstitutional, or (2) the litigant persists through a tortuous and protracted process of appeals, after a state trial court has found the facts, through the state-court system to this Court) and injuries not sanctioned by state law. To make this line of distinction determine the incidence of Civil Rights legislation serves to cover the bulk of cases where

---

[75] See, e. g., Cong. Globe, 42d Cong., 1st Sess. 482, 505–506, 697, App. 81–86, 315.

[76] Id., at App. 68.

federal judicial protection would be needed. To be sure, this leaves certain cases unprotected, namely, the few instances of federal constitutional violations not authorized by state statute, custom or usage and which concern interests wholly unrecognized by state statute or common law. But the cost of ignoring the distinction in order to cover those cases—the cost, that is, of providing a federal judicial remedy for every constitutional violation—involves pre-emption by the National Government, in the larger class of cases in which rights secured by the Fourteenth Amendment relate to interests of person and property having a state-law origin, of matters of intimate concern to state and local governments. One of the most persistently recurring motifs in the legislative history of the Ku Klux Act is precisely a reluctance to invade these regions of state and local concern except insofar as absolutely necessary for effective assurance of the Fourteenth Amendment's guarantees. Therefore, the line of distinction between state-authorized and unauthorized actions, as a line of compromise among positions concerning which the legislative evidence is clear that Congress wanted to, and did, compromise, is the most probable for the Act's draftsmen to have selected.

To attribute significance to this line of distinction is not to reduce the Ku Klux Act to having "merely a jurisdictional function, shifting the load of federal supervision from the Supreme Court" to an original federal tribunal. First, there are certain classes of cases where § 1979, construed as reaching only unconstitutional conduct authorized by state law, will accord "substantive" relief that would not have been available through the means of state-law, state-court litigation subject to the commands of the Supremacy Clause and to Supreme Court review. This would be the case, for example, if a Negro were to bring an action for damages against a state election official who had denied him the right to vote pursuant to discriminatory

state franchise provisions [77] in a State which did not recognize a common-law action for deprivation of the right to vote. Similarly, one whose home had been searched by state police acting under a state statute, regulation, custom or usage which authorized an unconstitutional intrusion could recover by a § 1979 action a measure of relief determined, as a "substantive" matter, by federal law, whereas Supreme-Court-reviewed state-court suit might have availed him only damages for technical trespass. And, second, with reference to the more numerous classes of cases in which the redress which a federal trial court might give would be approximately the same, "substantively," as that which could be recovered by state-court suit, the theory that the Reconstruction Congress could not have meant § 1979 principally as a "jurisdictional" provision granting access to an original federal forum in lieu of the slower, more costly, more hazardous route of federal appeal from fact-finding state courts, forgets how important providing a federal trial court was among the several purposes of the Ku Klux Act.[78] One may agree that in one sense § 1979 is not "merely" jurisdictional—not jurisdictional in the sense, for example, that § 3 of the 1866 Civil Rights Act was jurisdictional.[79] Section 1979 does

---

[77] See, e. g., Lane v. Wilson, 307 U. S. 268.

[78] See, e. g., the pages of debate cited in note 46, supra.

[79] That section gave the District and Circuit Courts of the United States concurrent jurisdiction of all causes, civil and criminal, "affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section" of the 1866 Act. It further provided: "The jurisdiction in civil and criminal matters hereby conferred on the district and circuit courts of the United States shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where such laws are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offences against law, the common law, as modified and changed by the constitution and statutes of the State wherein

create a "substantive" right to relief. But this does not negative the fact that a powerful impulse behind the creation of this "substantive" right was the purpose that it be available in, and be shaped through, original federal tribunals.

In truth, to deprecate the purposes of this 1871 statute in terms of analysis which refers to "merely . . . jurisdictional" effects, to "shifting the load of federal supervision," and to the "administrative burden on the Supreme Court," is to attribute twentieth century conceptions of the federal judicial system to the Reconstruction Congress. If today Congress were to devise a comprehensive scheme for the most effective protection of federal constitutional rights, it might conceivably think in terms of defining those classes of cases in which Supreme Court review of state-court decision was most appropriate, and those in which original federal jurisdiction was most appropriate, fitting all cases into one or the other category. The Congress of 1871 certainly did not think in such terms. Until 1875 there was no original "federal question" jurisdiction in the federal courts,[80] and the ordinary mode of protection of federal constitutional rights' was Supreme Court review.[81] In light of the then prevailing notions of the appropriate relative spheres of jurisdiction of state and

the court having jurisdiction of the cause, civil or criminal, is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern said courts in the trial and disposition of such cause . . . ." Act of April 9, 1866, § 3, 14 Stat. 27.

[80] Except, of course, during the time between the Act of February 13, 1801, § 11, 2 Stat. 92, and its repeal by the Act of March 8, 1802, § 1, 2 Stat. 132. "Federal question" jurisdiction was conferred by the Act of March 3, 1875, § 1, 18 Stat. 470.

[81] Recognition of this situation underlies the comments of Messrs. Blair and Storm, see note 57, *supra,* and the debate among Senators Edmunds, Trumbull and Carpenter referred to in the concurring opinion. See especially Cong. Globe, 42d Cong., 1st Sess. 576–578.

federal courts of first impression, any allowance of Federal District and Circuit Court competence to adjudicate causes between co-citizens of a State was a very special case, a rarity.[82]  To ask why, when such a special case was created to redress deprivations of federal rights under authority of state laws which abridged those rights, a special case was not also created to cover other deprivations of federal rights whose somewhat similar nature might have made the same redress appropriate, disregards the dominant jurisdictional thought of the day and neglects consideration of the fact that redress in a federal trial court was then to be very sparingly afforded.  To extend original federal jurisdiction only in the class of cases in which, constitutional violation being sanctioned by state law, state judges would be less likely than federal judges to be sympathetic to a plaintiff's claim, is a purpose quite consistent with the "overflowing protection of constitutional rights" which, assuredly, § 1979 manifests.[83]

[82] This is why Mr. Carpenter speaks of the Fourteenth Amendment's Enforcement Clause as working "one of the fundamental, one of the great, the tremendous revolutions effected in our Government by that article of the Constitution."  *Id.*, at 577.

[83] See the remarks of Mr. Dawes, a member of the Committee which reported the Ku Klux bill, *id.*, at 476:

"The first remedy proposed by this bill is a resort to the courts of the United States.  Is that a proper place in which to find redress for any such wrongs?  If there be power to call into the courts of the United States an offender against these rights, privileges, and immunities, and hold him to an account there, either civilly or criminally, for their infringement, I submit to the calm and candid judgment of every member of this House that there is no tribunal so fitted, where equal and exact justice would be more likely to be meted out in temper, in moderation, in severity, if need be, but always according to the law and the fact, as that great tribunal of the Constitution."

And see, *e. g.*, the remarks of Mr. Coburn, *id.*, at 459–460:

"Whenever, then, there is a denial of equal protection by the State, the courts of justice of the nation stand with open doors, ready to

254

Finally, it seems not unreasonable to reject the suggestion that state-sanctioned constitutional violations are no more offensive than violations not sanctioned by the majesty of state authority. Degrees of offensiveness, perhaps, lie largely in the eye of the person offended, but is it implausible to conclude that there is something more reprehensible, something more dangerous, in the action of the custodian of a public building who turns out a Negro pursuant to a local ordinance than in the action of the same custodian who turns out the same Negro, in violation of state law, to vent a personal bias? Or something

receive and hear with impartial attention the complaints of those who are denied redress elsewhere. Here may come the weak and poor and downtrodden, with assurance that they shall be heard. Here may come the man smitten with many stripes and ask for redress. Here may come the nation, in her majesty, and demand the trial and punishment of offenders, when all, all other tribunals are closed . . . .

"Can these means be made effectual? Can we thus suppress these wrongs? I will say we can but try. The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices or bad passions or terror more easily. The marshal, clothed with more power than the sheriff, can make arrests with certainty, and, with the aid of the General Government, can seize offenders in spite of any banded and combined resistance such as may be expected. Thus, at least, these men, who disregard all law, can be brought to trial. Here we stop. The court is to do the rest, acting under all its solemn obligations of duty to country and God. Can we trust it, or are we afraid of our own institutions? Does the grim shadow of the State step into the national court, like a goblin, and terrify us? Does this harmless and helpless ghost drive us from that tribunal—the State that mocks at justice, the State that licenses outlawry, the State that stands dumb when the lash and the torch and the pistol are lifted every night over the quiet citizen? We believe that we can trust our United States courts, and we propose to do so."

more reprehensible about the public officer who beats a criminal suspect under orders from the Captain of Detectives, pursuant to a systematic and accepted custom of third-degree practice, than about the same officer who, losing his temper, breaks all local regulations and beats the same suspect? If it be admitted that there is a significant difference between the situation of the individual injured by another individual and who, although the latter is an agent of the State, can claim from the State's judicial or administrative processes the same protection and redress against him as would be available against any other individual, and the situation of one who, injured under the sanction of a state law which shields the offender, is left alone and helpless in the face of the asserted dignity of the State, then, certainly, it was the latter of these two situations—that of the unprotected Southern Negroes and Unionists—about which Congress was concerned in 1871.[84]

---

[84] It is suggested that Congress knew there existed state constitutional guarantees of which state legislation might fall afoul, and that nevertheless there is found in the debates no "explanation of [the] exception to the general rule" which would obtain if § 1979 were applied to conduct authorized by state statute, ordinance, regulation, custom or usage, but violative of a state constitution. To regard such an application as an "exception" is to misconceive the incidence of § 1979 by regarding its operation from the wrong perspective. The question whether official action does or does not come within the statute depends not upon what state law the action does or does not violate, but upon what state law does or does not authorize the action. The state authorization against which Congress aimed § 1979 was authorization by the living, functioning law of the State, not authorization in strict conformity with what may have become no more than an unheeded pattern of words upon the closed pages of a State's books of legal learning. It meant to reach those "Deeply embedded traditional ways of carrying out state policy [which] . . . are often tougher and truer law than the dead words of the written text," see note 73, supra, and it would by its terms have reached the case supposed by my Brother HARLAN not as a matter of exception in need of explanation, but by its natural logic.

Again, an analysis which supposes that Congress, by §§ 1 and 2 [85] of the Ku Klux Act, was attempting to provide comprehensive coverage of a single problem and, therefore, may not be supposed to have left any aspect of the problem unprovided for, ignores that these two sections were in fact designed to cope with two wholly different problems—two wholly diverse evils. Section 2 was newly drafted in 1871, not, like § 1, taken over from the 1866 Act. It was both civil and criminal, not, like § 1, merely civil. It aimed exclusively at conspiracies, as § 1 did not. And, most important, it sought to protect only the federal right of equal protection, not, like § 1, all Fourteenth Amendment rights.[86] Because of its limited scope in this latter respect, those who drafted it and voted for it thought that it could constitutionally be made to reach instances of action having more tenuous connection with the lawfully asserted authority of the State than could a statute which also reached due process violations.[87] For the same reason, it does not reach isolated

---

[85] Section 2 of the Ku Klux Act attached civil and criminal liability to conspiracy "for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws . . . ." 17 Stat. 13. The civil provisions of this section were carried forward, as amended, in R. S. § 1980, and are now found in 42 U. S. C. § 1985. The criminal provisions, carried forward in R. S. § 5519, were declared unconstitutional in *United States* v. *Harris*, 106 U. S. 629, and *Baldwin* v. *Franks*, 120 U. S. 678.

[86] See Cong. Globe, 42d Cong., 1st Sess. 478, App. 315.

[87] The Fourteenth Amendment provides that no State shall "deprive" any person of life, liberty, or property without due process of law, and that no State shall "deny" to any person within its jurisdiction the equal protection of the laws. It is clear that the Forty-second Congress believed that "denial" could be worked by non-action, while "deprivation" required ill-action; thus, that the

instances of misuse of state authority, but only such as possess the character of "purposeful discrimination"[88] which amounts to a denial of equal protection. The evil that § 2 meant to stamp out was the evil of conspiracy— more particularly, the evil of the Klan, "a conspiracy, so far-flung and embracing such numbers, with a purpose to dominate and set at naught the 'carpetbag' and 'scalawag' governments of the day," that it appeared "able effectively to deprive Negroes of their legal rights and to close all avenues of redress or vindication." *Collins* v. *Hardyman*, 341 U. S. 651, 662.[89] The enormity and the power of this organization were what made it dangerous.[90] Section 1 aimed at another evil, the evil not of combinations dedicated to purposeful and systematic discrimination, but of violation of any rights, privileges, or immunities secured by the Constitution through the authority, enhanced by the majesty and dignity, of the States. Here it was precisely this authorization, this assurance that behind a constitutional violation lay the whole power of the State, that was the danger. One can agree that these two statutory sections may overlap unevenly rather than

---

scope of federal enforcing power under the Equal Protection Clause reached further, in respect of situations in which there was no assertion of legitimate state authority, than did the equivalent scope of power under the Due Process and Privileges and Immunities Clauses. See, *id.*, at 459, 482, 505–506, 514, 607–608, 697, App. 251, 315. This appears to be why § 2 was acceptable in its amended, while not in its original, form.

[88] *Snowden* v. *Hughes*, 321 U. S. 1, 9; see also *Lisenba* v. *California*, 314 U. S. 219, 226.

[89] I agree that this is not the appropriate occasion to pass upon the construction of § 1985.

[90] For an appreciation of the nature and character of the Ku Klux Klan as it appeared to Congress in 1871, see S. Rep. No. 1, 42d Cong., 1st Sess., and the voluminous report of the Joint Select Committee to inquire into the Condition of Affairs in the late Insurrectionary States, published as S. Rep. No. 41, pts. 1–13, and H. R. Rep. No. 22, pts. 1–13, 42d Cong., 2d Sess.

dovetail, but surely it is more plausible to regard this uneven overlap as a result of the diverse origins and purposes of the sections than to derive from it the justification for a construction of § 1979 which distorts the section by stretching it to cover a class of cases presenting *neither* the evil with which § 1, *nor* the evil with which § 2, of the Ku Klux Act was designed to cope.

## VI.

The present case comes here from a judgment sustaining a motion to dismiss petitioners' complaint. That complaint, insofar as it describes the police intrusion, makes no allegation that that intrusion was authorized by state law other than the conclusory and unspecific claim that "During all times herein mentioned the individual defendants and each of them were acting under color of the statutes, ordinances, regulations, customs and usages of the State of Illinois, of the County of Cook and of the defendant City of Chicago." In the face of Illinois decisions holding such intrusions unlawful and in the absence of more precise factual averments to support its conclusion, such a complaint fails to state a claim under § 1979.

However, the complaint does allege, as to the ten-hour detention of Mr. Monroe, that "it was, and it is now, the custom or usage of the Police Department of the City of Chicago to arrest and confine individuals in the police stations and jail cells of the said department for long periods of time on 'open' charges." These confinements, it is alleged, are for the purpose of interrogating and investigating the individuals arrested, in the aim of inducing incriminating statements, permitting possible identification of suspects in lineups, holding suspects *incommunicado* while police conduct field investigations of their associates and background, and punishing the arrested persons without trial. Such averments do pre-

sent facts which, admitted as true for purposes of a motion to dismiss, seem to sustain petitioners' claim that Mr. Monroe's detention—as contrasted with the night-time intrusion into the Monroe apartment—was "under color" of state authority. Under the few relevant Illinois decisions it is impossible to say with certainty that a detention *incommunicado* for ten hours is unlawful *per se*,[91] or that the courts of that State would hold that the lawless circumstances surrounding Mr. Monroe's arrest made his subsequent confinement illegal. On this record, then, petitioners' complaint suffices to raise. the narrow issue of whether the detention *incommunicado,* considered alone, violates due process.[92]

Since the majority's disposition of the case causes the Court not to reach that constitutional issue, it is neither necessary nor appropriate to discuss it here.

---

[91] Compare *People* v. *Frugoli,* 334 Ill. 324, 166 N. E. 129 (1929), and *Fulford* v. *O'Connor,* 3 Ill. 2d 490, 121 N. E. 2d 767 (1954), with *People* v. *Kelly,* 404 Ill. 281, 89 N. E. 2d 27 (1949).

[92] In considering the detention of Mr. Monroe as isolable from the invasion of the Monroe home for purposes of applying § 1979, one does not ignore that in its treatment of coerced-confession cases and deprivation-of-counsel cases coming here from state courts, this Court has looked to the whole sequence of activity by state authorities pertinent to the prosecution of a criminal defendant. *Malinski* v. *New York,* 324 U. S. 401, 412 (concurring opinion joined in, and made a majority view, at 438); *Watts* v. *Indiana,* 338 U. S. 49; *Turner* v. *Pennsylvania,* 338 U. S. 62; *Harris* v. *South Carolina,* 338 U. S. 68; *Gibbs* v. *Burke,* 337 U. S. 773. But these cases differ from the one at bar precisely in the fact that they do come here after the sustaining of a criminal conviction by the highest court of a State competent to act in the matter. In all such cases the processes of law administration of a State have rendered the final judgment of state law, and the federal question presented is whether the conviction has, in light of the totality of the events leading to that conviction, violated due process. The question in the instant case is the much narrower one whether petitioners have alleged conduct "under color" of state authority which deprives them of a Fourteenth Amendment right, and thus brought respondents' conduct within the specific requirements of the statute for initiating litigation in a Federal District Court.